**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

YVONNE M. BROOKS,

               Plaintiff,

          v.

HILLARY CLINTON,                         Civil Action No. 10-00646 (BAH)
Secretary of State,                      Judge Beryl A. Howell
U.S. Department of State,

               Defendant.

**MEMORANDUM OPINION**

      The plaintiff, Yvonne Brooks, is an African-American woman who worked as an administrative officer for the State Department from November 2003 to March 2007 pursuant to a contract that was renewable in one-year increments for a maximum period of five years. The plaintiff's supervisors decided not to renew her contract following its annual expiration in March 2007. Subsequently, the plaintiff brought this lawsuit against the State Department ("State") alleging that she was the victim of workplace discrimination. Specifically, the plaintiff alleges that her supervisors subjected her to racially disparate treatment and a racially hostile work environment, that State terminated her contract in retaliation for her seeking Equal Employment Opportunity counseling, and that State failed to provide reasonable accommodation for an alleged eye disability. The defendant has moved for judgment on the pleadings or, in the alternative, for summary judgment on the plaintiff's claims. The plaintiff opposes the defendant's motion. For the reasons explained below, summary judgment is denied on the plaintiff's retaliation claim and granted on all other claims.

## I.      BACKGROUND

The plaintiff filed this action against Hillary Clinton, in her official capacity as Secretary of State, on April 26, 2010.  Compl., ECF No. 1.  The Complaint alleges that the defendant violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, the Civil Rights Act of 1991, 42 U.S.C. § 1981a, 42 U.S.C. § 1981, and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, by unlawful and intentional discrimination based on her race, retaliation, hostile work environment, and failure to accommodate her physical disability.  *Id.* ¶ 1.

The plaintiff began working for State in November 2003.  *Id.* ¶ 11.  She worked as an Administrative Officer, Personnel Service Contractor to the Management Support Division ("MSD") at State's Bureau of Overseas Buildings Operations ("OBO").  *Id.*   The plaintiff's contract with State was a one-year contract that could be renewed in one-year increments up to a total of five years.  *See* Def.'s Ex. 1, hereinafter "Contract," at 5, art. 5.  The last renewal of her contract was for the year commencing April 2, 2006 and ending March 31, 2007.  Def.'s Ex. 1A at 3.

Initially, the plaintiff's immediate supervisor was Brian Clark and her second-line supervisor was Roberto Coquis.  Compl. ¶ 11.  During 2004 and 2005, Coquis, who is a Hispanic man, recognized the plaintiff's work as "outstanding" and "exemplary" and she received awards for her performance.  *See* Pl.'s Exs. 4-13.  Brian Clark left the OBO in 2005.  Compl. ¶ 13.  The plaintiff applied for Clark's position, but she was not selected.  *Id.* ¶ 15.  Instead, Coquis selected

David Spinale, who is a white man, to fill Clark's former position.[1]  *Id.*   Spinale thus became the

plaintiff's immediate supervisor.  The plaintiff asserts that in July 2006, after Spinale became her

manager, her workplace environment changed and Spinale, along with Coquis, began subjecting

her to a hostile work environment and discrimination.  Pl.'s Opp'n at 5; Compl. ¶ 16.

### A.       Racial Discrimination and Hostile Work Environment Allegations

The Court will first address the plaintiff's allegations that her supervisors subjected her to

racially disparate treatment and a racially hostile work environment.  The plaintiff, in her

opposition brief and the Complaint, identifies nine main categories of actions that allegedly

created a hostile work environment for her and constituted acts of racial discrimination.  Pl.'s

Opp'n at 5; Compl. ¶¶ 24-32, 41.

First, the plaintiff alleges Spinale sent her "hostile" email that "challenged and criticized

her work product."  Pl.'s Opp'n at 5.  For example, she contends that Spinale "falsely" claimed

that her "work-related reports were not substantially detailed and were sometimes submitted

late."  *Id.* at 6.

Second, the plaintiff cites a "hostile" email received from Coquis in November 2006 that

described her work as "crap."  *Id.* at 5.  Coquis inadvertently sent this email to the plaintiff.  *Id.*

at 8-9.  In a private email to a third-party, the plaintiff acknowledged that Coquis likely intended

to send this "hostile" email to her immediate supervisor, Spinale, rather than to her, but she also

---

[1] The plaintiff is not pursuing a claim based upon her non-promotion to Clark's position, but she "notes this event as part of the disparate treatment and hostile work environment."  Pl.'s Mem. in Opp'n to Def.'s Mot. for J. on the Pleadings or for Summ. J., ECF No. 30 ("Pl.'s Opp'n"), at 1 n.1.  The plaintiff also alleges in her Complaint that the defendant "further discriminated" against her when, on or around March 2007, he promoted a white woman to assume the plaintiff's duties even though the white woman allegedly lacked the proper credentials.  Compl. ¶ 27. The Court assumes that the plaintiff is also not pursuing that claim as she offers no development of it beyond the undeveloped and cursory allegation in the Complaint.

added that Coquis's email represented "[j]ust more ammo for my case and how he is so unprofessional." Pl.'s Ex. 30.

Third, the plaintiff claims she received unwarranted discipline regarding computer use. Compl. ¶¶ 20-21; Pl.'s Opp'n at 6. In late November 2006, the plaintiff received a negative counseling statement for allegedly saving two inappropriate images on a State Department hard drive. Compl. ¶ 20; Pl.'s Opp'n at 6. Apparently, one of the images was labeled "Spiderman" and the other depicted an aborted fetus. *See* Def.'s Stmt. of Mat. Facts Not in Dispute ("Def.'s SMF"), ¶ 11. Coquis had previously cautioned the plaintiff about inappropriate computer use in May 2006 when the plaintiff circulated an email containing racial jokes with the subject line "FW: Ten Truths." *Id*. ¶ 10. The body of the email message contained lists of "10 Truths Black and Hispanic people know but White people wont [sic] admit," "10 Truths White and Black People know but Hispanic people wont [sic] admit," and "10 Truths white and Hispanic people know but Black people wont [sic] admit." *Id.* ¶ 10; *see* Def.'s Ex. 9 ("10 Truths" email and response from Coquis). The plaintiff disputes that the racial jokes email "was an inappropriate email because Coquis knew that other employees in his office forwarded email containing humorous material." Pl.'s Resp. to Def.'s SMF ("Pl.'s SMF Resp.") ¶ 10. The plaintiff also denies knowledge of the inappropriate images found on her computer, pointing to the fact that, at Coquis's alleged instruction, she allowed other employees to use her computer login. *Id.* ¶ 11; Pl.'s Opp'n at 7. She contends that Coquis's instruction to allow others to use her login also constituted part of the hostile work environment and discrimination. Pl.'s SMF Resp. ¶ 11; Pl.'s Opp'n at 6-7.

Fourth, the plaintiff alleges she was charged for leave without pay for two hours when she had paid leave available. Compl. ¶ 32B.

4

Fifth, the plaintiff alleges that the defendant refused to reimburse her fully for travel expenses related to her attendance at a "Blacks in Government" conference.  *Id.* ¶ 32A.  It is undisputed, however, that the plaintiff ultimately received reimbursement for all travel expenses except for a $70 taxi fare for which the plaintiff produced no documentation.  Def.'s SMF ¶ 9; Pl.'s SMF Resp. ¶ 9.

Sixth, she alleges that her supervisors required her to submit daily reports of her work, but that other MSD administrative employees were not required to do so.  Compl. ¶ 32H.

Seventh, she alleges that her supervisors required her to turn in her government-issued cell phone in September 2006, but that white employees were not required to do so.  Pl.'s Opp'n at 7-8.

Eighth, the plaintiff alleges that she was not allowed to attend a training seminar that she had previously been told she could attend.  Compl. ¶ 32J.

Finally, the plaintiff claims that the termination of her employment was the "ultimate act of discrimination . . ."  Compl. ¶ 41.

## B.    Allegations Of Failure To Accommodate Disability

In addition to her claims of a hostile work environment and discrimination, the plaintiff alleges that the defendant "failed to reasonably accommodate [the plaintiff's] severe eye disability, despite her repeated requests for an accommodation."  *Id.* ¶ 34.  The plaintiff contends that she has an eye condition known as iritis that "sometimes causes inflammation, inability to see, and blurred vision," and that "interferes with her ability to do many things, including looking at a computer screen, reading small print, and performing other activities that require acute visual acuity."  Pl.'s Opp'n at 9.

The plaintiff provided the defendant with three doctor's notes regarding her eye condition. Def.'s SMF ¶ 20; Pl.'s SMF Resp. ¶ 20.[2]  The first note, dated January 20, 2006, stated that the plaintiff's eyes were dilated and she would have problems focusing for six to twelve hours.  Pl.'s Ex. 36.  It also stated "Pt is being treated for a serious eye problem & will need to be excused until resolution or able to keep eyes open."  *Id.*  The second note, dated January 24, 2006, indicated that the plaintiff was being treated for a severe eye condition reducing her visual acuity.  Def.'s Ex. 14 at 11.  The note asked that this be taken into account when tasks were assigned to the plaintiff and indicated that the plaintiff was on light duty.  *Id.* The third note – dated September 24, 2007, several months after the end of the plaintiff's tenure at State – purports to convey the contents of a prior note provided to the plaintiff's employer in December 2006 that stated the plaintiff "is being treated for a chronic severe eye condition (since April '06) that decreases visual acuity.  Please keep this in mind when assigning tasks until resolution or improvement occurs."  Pl.'s Ex. 35.

The plaintiff contends she requested a reasonable accommodation for her eye disability on December 15, 2006 and thereafter by requesting that a portion of her duties involving the review of PowerPoint slides created by other managers be reassigned to another employee. Compl. ¶¶ 37-40.  The plaintiff alleges that Coquis and Spinale refused to even entertain this request for reasonable accommodation.  *Id.*

---

[2] These three doctors' notes were originally introduced by the defendant, who moved for the documents to be filed under seal.  Def.'s Ex. 14 at 10-12, ECF 21-22.  This motion was granted.  Minute Order (Mar. 28, 2011).  The plaintiff later filed two of the three doctors' notes on the docket as unsealed exhibits to her Memorandum in Opposition to the instant motion.  Pl.'s Ex. 35-36, ECF 32.

### C.      Retaliation Allegations

The plaintiff also alleges that Coquis and Spinale retaliated against her for engaging in protected Equal Employment Opportunity ("EEO") activity by declining to renew her contract. *Id.* ¶¶ 41-42.  The plaintiff contends that she first informally complained to an EEO counselor, Anita Carey, on November 16, 2006.  Pl.'s SMF Resp. ¶ 22; Pl.'s Ex. 44.  The plaintiff also asserts that she complained to Coquis about alleged harassment in October 2006 and on other dates.  Pl.'s Ex. 61, Affidavit of Yvonne M. Brooks, sworn to Sept. 28, 2007 ("Brooks Aff.")  ¶ 79; Pl.'s Ex. 44.  On January 26, 2007, the plaintiff submitted an "informal" EEO complaint letter to the director of OBO, General Williams.  Brooks Aff. ¶ 106.  The plaintiff was notified that her contract would not be renewed in February 2007, although the record shows that Coquis decided not to renew the plaintiff's contract on November 24, 2006.   Brooks Aff. ¶¶ 107-109; Def.'s Ex. 15.  The plaintiff formally sought EEO counseling on March 13, 2007.  Def.'s SMF ¶ 22; Pl.'s SMF Resp. ¶ 22.  The plaintiff's contract expired on March 31, 2007.  Def.'s Ex. 1A at 3.

### D.      Relief Sought

The plaintiff's Complaint alleges four counts:  Retaliation (Count I), Racial Discrimination (Count II), Failure to Reasonably Accommodate Disability (Count III), and Hostile Work Environment (Count IV).  Compl. ¶¶ 43-49.  Based on these counts, the plaintiff seeks reinstatement, back pay with interest and benefits, compensatory damages, record correction, and an injunction against further discrimination and retaliation.  *Id.* ¶ 50.

### E.      Procedural History

This case was reassigned to the undersigned presiding judge on January 20, 2011.  The Court held an initial scheduling conference on February 11, 2011, and issued a scheduling order

on February 17, 2011.  *See* ECF No. 13.  The scheduling order provided that the "parties shall have until April 4, 2011 to file any dispositive motions that will be filed prior to the end of discovery."  *Id.*  The Court also bifurcated discovery into a written discovery phase and a deposition discovery phase.  *Id.*  Under the scheduling order, written discovery began on March 4, 2011, but deposition discovery was not to begin until the Court's resolution of any dispositive motions filed by April 4, 2011.  *Id.*  The scheduling order also provided that "[i]n accordance with the agreement of both parties in their separate proposed scheduling orders filed on February 15, 2011 . . . [a]dditional parties shall be joined or pleadings amended by March 4, 2011."  *Id.*

On March 4, 2011, the defendant filed an amended answer.  ECF No. 16.  On March 21, 2011, the plaintiff filed a motion to strike the defendant's amended answer as untimely because the defendant did not obtain leave of court or the consent of the plaintiff to file the amended answer.  ECF No. 20.  In response, on March 30, 2011, the defendant filed a motion for leave to amend its answer *nunc pro tunc* on March 4, 2011.  ECF No. 24.  The defendant stated that it did not seek leave of court or the plaintiff's consent to file its amended answer because it interpreted the Court's scheduling order, which provided that "[a]dditional parties shall be joined or pleadings amended by March 4, 2011," as prospectively authorizing the amendment.  See *id.*  The plaintiff is correct that the Federal Rules of Civil Procedure required the defendant to seek leave of court to file an amended pleading.  Fed. R. Civ. P. 15(a)(2) (if 21 days after service of a pleading has elapsed, "a party may amend its pleading only with the opposing party's written consent or the court's leave.").  The Court's scheduling order, consistent with the parties' own agreement, see ECF Nos. 11-12, authorized the filing of any motion proposing amendment of the pleadings until March 4, 2011.  ECF 13.  *See* Fed. R. Civ. P. 16(b)(3)("The scheduling order must limit the time to . . . amend the pleadings . . .").

Motions to amend pleadings filed within the time set by a scheduling order are subject to review under the standard of Rule 15, which instructs that the "court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).  By contrast, such motions filed after a scheduling order deadline has passed are subject to the more stringent "good cause" standard of Rule 16(b)(4) for modification of a scheduling order.  *Cf. KG Litig. v. Samsung Techwin Co. (In re Papst Licensing GmbH & Co.)*, 762 F. Supp. 2d 56, 59 (D.D.C. 2011) (good cause standard of Rule 16 applies to motion for leave to amend a pleading after a scheduling order deadline has passed); *Lurie v. Mid-Atlantic Permanente Med. Group, P.C.*, 589 F. Supp. 2d 21, 23 (D.D.C. 2008) (same, explaining "[t]o hold otherwise would allow Rule 16's standards to be short circuited by those of Rule 15 and would allow for parties to disregard scheduling orders, which would undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier." ) (citation and internal quotation marks omitted).  The defendant in this case was intending to comply with, not cavalierly disregard, the scheduling order for amendment of pleadings.  The defendant simply misconstrued its obligations under the scheduling order and, upon this discovery, promptly cured the defect with an appropriate motion.  In these circumstances, the Court finds that the defendant satisfies both standards under Rules 15(a) and 16(b).  Accordingly, the Court denies the plaintiff's motion to strike the amended answer, grants the defendant's motion for leave to amend its answer *nunc pro tunc* on March 4, 2011, and will treat the defendant's amended answer as filed on March 4, 2011.

On March 21, 2011, the defendant filed a motion for judgment on the pleadings or, in the alternative, for summary judgment.  ECF No. 19.  This motion is presently before the Court.  For the reasons explained below, summary judgment is granted in part and denied in part.

## II.      STANDARD OF REVIEW

The defendants have moved pursuant to Federal Rule of Civil Procedure 12(c) for

judgment on the pleadings, or, alternatively, for summary judgment pursuant to Federal Rule of

Civil Procedure 56.  In deciding a motion under Rule 12(c), "courts employ the same standard

that governs a Rule 12(b)(6) motion to dismiss." *Lans v. Adduci Mastriani & Schaumberg*

*L.L.P.*, 786 F. Supp. 2d 240, 265 (D.D.C. 2011) (citation omitted).  "[T]he Court may not rely on

facts outside the pleadings and must construe the complaint in the light most favorable to the

non-moving party." *Id*.  If, on a motion under Rule 12(c), "matters outside the pleadings are

presented to and not excluded by the court, the motion must be treated as one for summary

judgment under Rule 56." Fed. R. Civ. P. 12(d); s*ee also Vest v. Dep't of the Air Force*, 793 F.

Supp. 2d 103, 112 (D.D.C. 2011); *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 17 n.4

(D.D.C. 2011); *Strong-Fischer v. Peters*, 554 F. Supp. 2d 19, 22 (D.D.C. 2008).  Since matters

beyond the pleadings will be considered here, the defendant's motion will be treated as one for

summary judgment.

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law" based upon the pleadings, depositions, and affidavits and other

factual materials in the record.  Fed. R. Civ. P. 56(a), (c); *Ali v. Tolbert*, 636 F.3d 622, 628 (D.C.

Cir. 2011); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  In evaluating the record, the Court

"need consider only the cited materials, but it may consider other materials in the record."  Fed.

R. Civ. P. 56(c)(3).  "At the summary judgment stage, facts must be viewed in the light most

favorable to the nonmoving party only if there is a genuine dispute as to those facts."  *Scott v.*

*Harris*, 550 U.S. 372, 380 (2007) (citation and quotation marks omitted).  The burden is on the

moving party to demonstrate that there is an "absence of a genuine issue of material fact" in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## III.   DISCUSSION

### A.   Racial Discrimination Claims

The plaintiff has alleged that various actions by her supervisors constituted discrete acts of racial discrimination and also combined to create a hostile work environment based on race. These two theories of discrimination are independently actionable under Title VII.  The Court will first analyze the plaintiff's claims of racial discrimination and will then address her hostile work environment claims.

### 1.   Legal Standard

"Title VII of the Civil Rights Act, as amended, provides that all 'personnel actions affecting employees or applicants for employment' in Executive agencies 'shall be made free from any discrimination based on race.'" *Jackson v. Gonzales*, 496 F.3d 703, 706 (D.C. Cir. 2007) (quoting 42 U.S.C. § 2000e-16(a)).  "Under Title VII . . . the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, [or] national origin. . ." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).  An adverse employment action generally entails a "tangible employment action evidenced by firing, failing to promote, a considerable change in benefits, or reassignment with significantly different responsibilities." *Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003).  "Where, as here, the record contains no direct evidence that the adverse employment action of which the plaintiff complains was caused by prohibited discrimination, we turn to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973), to analyze the claim." *Jackson,* 496 F.3d at 706 (quoting *Holcomb v. Powell*, 433

F.3d 889, 895 (D.C. Cir. 2006)).  "Although intermediate evidentiary burdens shift back and

forth under this framework, the ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Id.*

(internal quotation marks and alteration omitted).  Where an employer has asserted legitimate,

non-discriminatory reasons for the actions being challenged,

> the district court need not - *and should not* - decide whether the plaintiff actually
> made out a prima facie case under *McDonnell Douglas*. Rather, in considering an
> employer's motion for summary judgment . . . the district court must resolve one
> central question: Has the employee produced sufficient evidence for a reasonable
> jury to find that the employer's asserted non-discriminatory reason was not the
> actual reason and that the employer intentionally discriminated against the
> employee on the basis of race, color, religion, sex, or national origin?

*Diggs v. Potter*, 700 F. Supp. 2d 20, 40 (D.D.C. 2010) (quoting *Brady v. Office of Sergeant at*

*Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)); *see also Hamilton v. Geithner*, No. 10-5419, 2012

WL 119134, at *5 (D.C. Cir. Jan. 17, 2012).

### 2.      Analysis of the Challenged Actions

As discussed above, the plaintiff, in her opposition brief and Complaint, alleges nine

categories of actions in which she experienced racial discrimination and a hostile work

environment.  Pl.'s Opp'n at 5; Compl. ¶¶ 24-32, 41.  The Court will address each of these

alleged instances or categories seriatim below.

### i.      Hostile Email From Spinale

The plaintiff claims that her immediate supervisor, Spinale, treated her more harshly than

white employees by sending her "harassing emails" that "challenged and criticized her work

product."  Pl.'s Opp'n at 5.  For example, the plaintiff states that "Spinale falsely claimed that

Ms. Brooks' work-related reports were not substantially detailed and were sometimes submitted

late."  *Id.* at 6.  These emails cannot sustain a discrimination claim, among other reasons,

because they do not constitute an adverse employment action.  An "adverse employment action"

requires a showing of "materially adverse consequences affecting the terms, conditions, or

privileges of [plaintiff's] employment or future employment such that a trier of fact could find

objectively tangible harm."  *Doe v. Roberts*, No. 09-2349, 2011 WL 6257234, at *3 (D.D.C.

Dec. 14, 2011) (internal emphasis omitted).  The plaintiff here has merely alleged that her

supervisor supervised and critiqued her work.  Such supervisory acts cannot constitute an

adverse employment action because there is no showing of any materially adverse consequences

to the terms, conditions, or privileges of employment.

### ii.        Hostile Email From Coquis

Next, the plaintiff alleges that a "hostile" email from Coquis constituted discrimination.

This email, which Coquis sent in response to a weekly work report created by the plaintiff,

stated, in its entirety, "This is crap. This is what she should be doing in 1 day!!!!"  Pl.'s Ex. 30.

It appears undisputed – and it is obvious from the text of the email itself – that Coquis

inadvertently sent this email to the plaintiff.  Coquis has explained that this email resulted from

frustration with the plaintiff's work quality, and that he "recognized that the comments were

inappropriate and apologized for the comments. . ."  Def.'s Ex. 2., Affidavit of Robert J. Coquis,

sworn to Dec. 12, 2007 ("Coquis Aff.") ¶ 60.  In any event, this email also did not constitute an

adverse employment action because it also did not rise to the level of a material change to the

plaintiff's terms or conditions of employment.

### iii.        Discipline Regarding Computer Use

The plaintiff contends that her supervisors discriminated against her by giving her two

"negative counseling statements indicating that she saved two inappropriate images, including

one labeled Spiderman.jpg, on an Agency-owned computer hard drive."  Pl.'s Opp'n at 6-7.  The

plaintiff denies she saved these images and complains that her supervisors discriminated against her by advising her to allow other staff to log in under her computer profile. *Id.* at 5-7. The disciplinary citations the plaintiff received – as well as the alleged direction to allow other staff to use her computer – would not, on their own, be adverse employment actions. *Hyson v. Architect of Capitol*, 802 F.Supp.2d 84, 102 (D.D.C. 2011) ("A letter of counseling, written reprimand, or unsatisfactory performance review, if not abusive in tone or language or a predicate for a more tangible form of adverse action, will rarely constitute materially adverse action under Title VII.")

### iv.    Denial of Leave

The plaintiff has alleged that on December 12, 2006, December 15, 2006, and "several other dates," the defendant charged her with leave without pay because of her race. Compl. ¶ 32B; Pl.'s Opp'n at 5. The plaintiff states that, on December 12, 2006, she submitted a request to Spinale and Coquis for one hour of sick leave for the following day, December 13, 2006. Brooks Aff. ¶ 100. Coquis did not review this request until December 14, 2006, *id.* ¶ 102, and denied the request because the plaintiff had not provided advance notice of the request by phone or by email, *id.* A similar sequence of events unfolded regarding another hour of leave the plaintiff requested for December 15, 2006. *Id.* ¶ 104. The plaintiff claims she was charged for leave without pay for these two hours, despite the fact that she had available sick leave. *Id.* ¶¶ 104-105. Coquis justified his decision to deny the leave by explaining that "[i]n the past, [the plaintiff] had provided email or phone notification if she had to depart the office for an emergency . . . and the leave was always approved," but that "[e]ventually [she] began to be

negligent on providing prior notification of her need to be out of the office," which led to the December 2006 leave disputes.[3]  Coquis Aff. ¶ 26.

In the plaintiff's response to the defendant's statement of material facts, she states that it "was customary for employees to request emergency leave by phone as Brooks did and other employees, including Nicolette Schmidt, a White female, routinely requested leave by telephone and that leave was approved."  Pl.'s SMF Resp. ¶ 17.  This response is puzzling, however, because the record evidence to which the plaintiff cites, pages 30-32 of the plaintiff's affidavit, clearly states that the plaintiff requested the leave "via courier" and not by phone, and that Coquis denied the request precisely because the plaintiff did not provide notice by phone or email.  Brooks Aff. ¶¶ 100-104.  Coquis confirms this account in his own affidavit, where he explains that he denied the leave because she did not provide advance notification of her request by email, phone, or by updating the office leave calendar.  Coquis Aff. ¶ 26.

In any event, the denial of two hours of leave is not sufficiently significant to constitute an adverse employment action.[4]  *See Dorns v. Geithner*, 692 F. Supp. 2d 119, 129 (D.D.C. 2010) ("[T]he denial of the plaintiff's request to take three hours of advanced sick leave or leave without pay, do[es] not rise to the level of adverse employment actions under Title VII."); *Threatt v. Donovan*, 380 Fed. App'x 544, 548 (7th Cir. 2010) (employee charged with two hours of being absent without leave did not establish adverse employment action).  Moreover, the

---

[3] There is some discrepancy over the precise type of leave the plaintiff requested.  *Compare* Coquis Aff. ¶ 27 (referring to request for "annual leave" on December 13, 2006) *with* Brooks Aff. ¶ 100 (referring to request for "sick leave" for that date).  This discrepancy is immaterial here.

[4] To the extent that the Complaint references other unspecified incidents of denial of leave, these claims are not explained in the plaintiff's response to the defendants' statement of material facts not in dispute or in the plaintiff's opposition.

defendant has presented a legitimate, non-discriminatory explanation for the denial of leave and there is insufficient evidence to show that the real reason for the denial was the plaintiff's race.

### v.        Reimbursement of Travel Expenses

The plaintiff claims discrimination because the defendant "[r]efused to reimburse her for full travel expenses" relating to her attendance at a "Blacks in Government" conference in 2006. Pl.'s Opp'n at 5; Compl. ¶ 32A.  Notably, the plaintiff was one of only three employees Coquis selected to attend this conference. *See* Def.'s Ex. 7 at 1 (April 20, 2006 memo from Coquis noting that it was "a very challenging decision" to select the conference attendees).  In advance of the conference, Coquis requested that "all receipts" be submitted for expense reimbursements. *Id.*  Although initially the plaintiff's reimbursement claims were denied, it is undisputed that the plaintiff ultimately received reimbursement for all travel expenses except for a $70 taxi fare for which the plaintiff produced no documentation.  Def.'s SMF ¶ 9; Pl.'s SMF Resp. ¶ 9.  The plaintiff contends that agency regulations do not require documentation for this $70 expense, Pl.'s SMF Resp. ¶ 9, but Coquis did request "all receipts" for expenses in advance of the conference, Def.'s Ex. 7 at 1.  The Court finds this episode cannot constitute an adverse employment action.  Moreover, the defendant has asserted a legitimate, non-discriminatory reason for not reimbursing this expense – lack of documentation in violation of his April 20, 2006 request for receipts, and there is no evidence to support an inference that racial discrimination was the real reason for the denial of reimbursement.

### vi.        Daily Work Reports

The plaintiff also claims discrimination because her supervisors required her to submit daily reports of her work.  Coquis has stated that he imposed this requirement in December 2006 because he "was not satisfied that [the plaintiff] sufficiently understood her responsibilities. . . ."

Coquis Aff. ¶ 62.  The requirement to submit reports regarding the status of her work does not constitute an adverse employment action.  *See Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (holding that requiring plaintiff to "submit biweekly reports on the status of her work" was not an adverse employment action, but rather a minor inconvenience and alteration of responsibilities); *Ali v. District of Columbia Government*, No. 08-01950, 2011 WL 4063234, at *6 (D.D.C. Aug. 31, 2011) (requirement to write special reports not an adverse employment action).

### vii.     Discontinuation of Work-Provided Cellular Phone

The discontinuation of the plaintiff's work-issued cellular telephone also does not constitute an adverse employment action.  *See O'Neal v. City of Chicago*, 392 F.3d 909, 912 (7th Cir. 2004) (lateral transfer resulting in, *inter alia*, loss of work-provided cell phone did not constitute adverse employment action).  In addition, the defendant has provided a legitimate, non-discriminatory explanation for discontinuing the plaintiff's work-issued phone and there is no evidence that race was the real reason for the decision.  According to the defendant, the plaintiff's cell phone was discontinued following a Bureau-wide review of cell phone use and the decision to discontinue her phone relied on factors including the plaintiff's "history of not carrying her cell phone, not answering her cell phone, and, at one time, a history of cell phone abuse."  Coquis Aff. ¶ 61; *see also* Def.'s Ex. 11 (2004 warning letters regarding the plaintiff's excessive cell phone use and 2006 notice regarding the disappearance of the plaintiff's phone).

### viii.     Denial of Attendance at Training Seminar

The plaintiff alleges that she was denied approval to attend a training seminar that she had originally been cleared to attend.  Pl.'s Opp'n at 5; Compl. ¶ 32J.  This allegation does not constitute an adverse employment action either.  *Doe*, 2011 WL 6257234, at *3 ("[T]he denial of

a single training or travel opportunity does not constitute an adverse employment action unless the plaintiff can tie the alleged discriminatory employment action to some actual, tangible adverse employment consequence.") (citation and internal quotation marks omitted).

### ix.    Non-Renewal of the Plaintiff's Contract

The plaintiff alleges that the "ultimate act of discrimination" was the termination of her contract.  Compl. ¶ 41.  The question for the Court is whether there is "sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason [for the non-renewal of the plaintiff's contract] and that the employer intentionally discriminated against the employee on the basis of race. . . ." *Brady*, 520 F.3d at 494.[5]

The answer to this key question is no.  Given the record evidence, no reasonable jury could find that the plaintiff's employer intentionally discriminated against her based on race in declining to renew her contract.  First, the defendant has advanced legitimate, non-discriminatory reasons for the non-renewal of the plaintiff's contract, including that the office "re-prioritized support service deliverables and [the plaintiff's position] was no longer providing value to our mission . . . [and] has not been re-advertised nor filled" since the plaintiff's departure.  Coquis Aff. ¶ 39.  The defendant has, for example, cited the plaintiff's inappropriate computer use as one of the reasons for the non-renewal of the plaintiff's contract.  *See* Coquis Aff. ¶ 39.  Second, setting aside the issue of the two inappropriate computer images for which the plaintiff denies responsibility, the defendant's explanation for the non-renewal of the plaintiff's contract also cited the plaintiff's circulation of "inappropriate racial jokes" for which Coquis cautioned her in May 2006.  Coquis Aff. ¶ 39.  It is undisputed that the plaintiff circulated these racial jokes using

---

[5] The parties have not addressed whether the non-renewal of the plaintiff's contract was an adverse employment action but the Court will assume it is for the purpose of deciding the instant motion.

her State Department email account and that Coquis promptly counseled her that this email was inappropriate.  *See* Def.'s Ex. 9 (racial jokes email and cautionary response from Coquis). Indeed, this incident represents the only conduct in the record with overt racial overtones. Viewing the record as a whole, there is simply no evidence to support any inference of racial discrimination against the plaintiff.  To the contrary, racial discrimination here would be particularly surprising since Coquis himself previously lauded the plaintiff's work in earlier years, describing her prior work as "outstanding" and recognizing her prior contributions with performance awards.  *Cf. Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) (noting that "[i]f [the supervisor] did not want to work with [plaintiff] because of her race or gender, it would be odd to select her and then immediately start ginning up reasons to dismiss her.").

Summary judgment for the defendant is appropriate where, as here, the defendant has advanced a legitimate, non-discriminatory reason for the challenged action and there is insufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason for the action.  *See Brady*, 520 F.3d at 494.

### B.      Hostile Work Environment Claims

While none of the individual incidents of purported discrimination alleged by the plaintiff can survive the defendant's motion for summary judgment, the plaintiff also argues that all of these incidents combined created a hostile work environment, which is an actionable form of discrimination under Title VII.  Summary judgment for the defendant is also appropriate on the plaintiff's hostile work environment claim.

"It is unlawful to 'requir[e] people to work in a discriminatorily hostile or abusive environment.'"  *Douglas-Slade v. LaHood*, 793 F. Supp. 2d 82, 100 (D.D.C. 2011) (quoting

*Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)).  In order to prevail on a hostile work

environment claim, a plaintiff must show that her workplace "is permeated with 'discriminatory

intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions

of the victim's employment and create an abusive working environment'" *Id.* (quoting *Harris*,

510 U.S. at 21).  "To determine whether a hostile work environment exists, the court looks to the

totality of the circumstances, including the frequency of the discriminatory conduct, its severity,

its offensiveness, and whether it interferes with an employee's work performance."  *Id.* at 101

(quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008)). "Isolated incidents do

not form a hostile work environment claim."  *Id.*

The plaintiff's relationship with her supervisors plainly deteriorated during the last

several months of the plaintiff's employment.  "Nothing in the record suggests, however, that

plaintiff endured intimidation, ridicule, insult, or other behavior that was offensive, pervasive,

severe, or abusive."  *Id.*  Rather, the plaintiff's complaints relate primarily to the management

style of her supervisors, and "such assertions cannot support a hostile work environment claim."

*Id.* (citing *Allen v. Napolitano*, 774 F. Supp. 2d 186, 205-06 (D.D.C. 2011)); *see also Johnson v.

Bolden*, 699 F. Supp. 2d 295, 302 (D.D.C. 2010) ("[N]early all of plaintiff's allegations of a

hostile work environment, even if taken as true, amount to nothing more than plaintiff's

objections to the management style of [the supervisors in] his chain of command").  The

plaintiff's claims that Spinale and Coquis criticized her work product, required her to submit

daily work reports, denied her request to attend a training seminar, denied requests for leave

unless she gave advance notice by phone or by email, and discontinued her work-issued cell

phone all fall under this category.

Moreover, there must be a "linkage between the hostile behavior and the plaintiff's membership in a protected class for a hostile work environment claim to proceed." *Douglas-Slade*, 793 F. Supp. 2d at 101 (citing *Na'im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009)). The plaintiff, however, fails to make any linkage.  As discussed above, the only conduct in the record with overt racial overtones is the plaintiff's own emailing of racial jokes in May 2006, for which Coquis cautioned her.  In addition, it is unlikely that Coquis would have discriminated against the plaintiff based on race, given his prior praise and support for her work.

"Hostile work environment claims are not meant to set a general code for the workplace." *Id.* at 101-102 (citation omitted).  "Even an employee who reports discriminatory behavior is not immunized from those petty slights or minor annoyances that often take place at work and that all employees experience."  *Id.* at 101 (quoting *Kelly v. Mills*, 677 F. Supp. 2d 206, 222 (D.D.C. 2010)).  The plaintiff "cannot convert ordinary tribulations of the workplace . . . into an actionable hostile work environment claim."  *Id.* at 102.  In sum, the factual allegations and evidence in the record here are insufficient to enable a reasonable jury to find that the plaintiff experienced a workplace permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of her employment.  Accordingly, summary judgment will be entered for the defendant on the plaintiff's hostile work environment claims.

### C.      Retaliation Claims

The plaintiff also alleges that Coquis and Spinale retaliated against her for engaging in protected EEO activity by declining to renew her contract.  Compl. ¶¶ 41-42.  The record shows that Coquis decided not to renew the plaintiff's contract on November 24, 2006.  Def.'s Ex. 15.  The plaintiff was notified that her contract would not be renewed in February 2007.  Brooks Aff.

¶¶ 107-109.  The defendant argues that the plaintiff cannot state a claim for retaliation because the plaintiff did not formally seek EEO counseling until March 13, 2007, after the plaintiff was notified of the decision not to renew the plaintiff's contract.  Def.'s SMF ¶ 22; Pl.'s SMF Resp. ¶ 22.  The plaintiff contends, however, that she previously complained to an EEO counselor, Anita Carey, on November 16, 2006.  Pl.'s SMF Resp. ¶ 22; Pl.'s Ex. 44.  The record also reflects the plaintiff's claims that she complained to Coquis about alleged harassment in October 2006 and on other dates.  Brooks Aff. ¶ 79; Pl.'s Ex. 44.

The legal framework for demonstrating retaliation under Title VII is similar to the framework for establishing discrimination.  A prima facie case of retaliation requires a plaintiff to show that "(1) he engaged in protected activity; (2) he was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action." [6] *Hamilton v. Geithner*, 2012 WL 119134, at *11 (quoting *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007)); *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007).  "Once the plaintiff has made a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the challenged employment action."  *Bright v. Copps*, No. 08-755, 2011 WL 6123470, at *7 (D.D.C. Dec. 9, 2011) (citation, quotation marks, and alteration omitted).  "However, the D.C. Circuit has stressed that once an employer has proffered a nondiscriminatory reason, the *McDonnell Douglas* burden-shifting framework disappears, and the court must simply determine whether the plaintiff has put forward enough evidence to defeat the proffer and support a finding of retaliation."  *Id.* (citing *Woodruff*, 482 F.3d at 530).  "Where, as here, the employer has proffered a legitimate, [non-retaliatory] reason

---

[6] As with the plaintiff's discrimination claim, the defendant has not argued that the non-renewal of the plaintiff's contract was not an adverse employment action and, therefore, the Court will assume that it is an adverse employment action for the purposes of deciding this motion.

for a challenged employment action, the central question is whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted [non-retaliatory] reason was not the actual reason and that the employer intentionally [retaliated] against the employee in violation of Title VII." *McGrath v. Clinton*, No. 10-5043, 2012 WL 247996, at *5 (D.C. Cir. Jan. 27, 2012) (citation and quotation marks omitted).

The defendant argues that the plaintiff cannot state a claim for retaliation because the plaintiff did not formally seek EEO counseling until March 13, 2007, but "[i]t is well settled that Title VII protects informal, as well as formal, complaints of discrimination." *Richardson v. Gutierrez*, 477 F. Supp. 2d 22, 27 (D.D.C. 2007) (citing cases); *see also Bell v. Gonzales*, 398 F. Supp. 2d 78, 94 (D.D.C. 2005) ("Initiation of EEO counseling to explore whether an employee has a basis for alleging discrimination constitutes protected activity, even in the absence of an unequivocal allegation of discrimination.").

The plaintiff alleges that she sought informal EEO counseling before November 24, 2006, the day on which Coquis decided not to renew her contract. Def.'s Ex. 15. While the plaintiff's evidence amounts to little more than her bare assertion with only limited corroboration, the Court at this stage must view the evidence in the light most favorable to the plaintiff. In doing so, the Court concludes that a reasonable jury could find for the plaintiff. The plaintiff asserts that on November 16, 2006, she contacted an EEO counselor, Anita Carey, about her complaints of discrimination. Pl.'s SMF ¶ 1; Pl.'s SMF Resp. ¶ 22; Pl.'s Ex. 44; Pl.'s Ex. 48. Plaintiff's Statement of Material Facts states that "Ms. Brooks complained about discrimination to her second level supervisor, third level supervisor, Anita Cary, and Agency EEO counselor in November 2006." Pl.'s SMF ¶ 1. Plaintiff's Response to Defendant's Material Facts Not in Dispute reemphasizes that plaintiff spoke with an EEO Counselor in November 2006. Pl.'s SMF

23

Resp. ¶ 22.[7]   The evidentiary support for plaintiff's claim is contained in two exhibits.  See Pl.'s

Ex. 44; Pl.'s Ex. 48.  Plaintiff's Exhibit 44 consists of a single page, page 15, of an EEO

"Counselor's Report."  *See* Def. Ex. 3 for the complete report (EEO Counselor's Report, dated

June 8, 2007).  The document includes the following statement from the plaintiff: "I have been

trying to file an EEO Complaint since November 2006.  I initially informally informed Anita

Carey EEO Representative of my harassment and hostile working conditions.  I then tried to set

up an appointment to file an official complaint in December 2006.  She informed me that she had

to take her daughter to the airport and she would call me when she was available.  I never

received a phone call back."  Pl.'s Ex. 44.  Plaintiff's Exhibit 48 consists of a single page labeled

"Formal Complaint" and "Page 9 of 37."  The complete "Formal Complaint" does not appear to

be in the record.  The document contains the exact same statement excerpted above from Exhibit

44: "I have been trying to file an EEO Complaint since November 2006 . . ."  Pl.'s Ex. 48.  The

defendant argues, in reference to Exhibit 44 in particular, that "[t]hese are pages from the EEO's

Counselor's Report in which Plaintiff recites her bare allegations, nothing more."  Def.'s Reply

Mem. at 14.  While the Court recognizes that this evidentiary support is indeed thin, taken in the

light most favorable to the plaintiff, plaintiff's alleged "initiation of EEO counseling" on

November 16 is sufficient to save her retaliation claim from summary judgment.  *Bell*, 398 F.

Supp. 2d at 94.

　　　　The record shows that Coquis decided not to renew the plaintiff's contract approximately

a week after Brooks allegedly contacted an EEO Counselor, on November 24, 2006, by sending

---

[7] The Plaintiff's Response to Defendant's Material Facts Not in Dispute actually asserts that "Ms. Brooks engaged in prior protected activity because she sought out and complained to an EEO counselor, Anita Carey 'or about November 16, <u>2011</u>'" but the Court assumes that she means November 16, 2006 as stated in her Statement of Material Facts.  *Compare* Pl. SMF ¶ 1 *with* Pl.'s SMF Resp. ¶ 22.

an email to human resources that stated, in relevant part: "I have come across more information that has influenced me toward not renewing her contract in April of 2007.  I will provide HR an official letter at that point if termination of the contract does not occur prior."  Def.'s Ex. 15.  The temporal proximity of eight days between the alleged initiation of EEO counseling and the cryptic non-renewal decision alluding to Coquis coming across "new information" about the plaintiff is sufficient to establish a prima facie case of retaliation.  *Hamilton*, 2012 WL 119134, at *11 ("[t]emporal proximity can indeed support an inference of causation, but only where the two events are very close in time") (quoting *Woodruff*, 482 F.3d at 529).  The defendant suggests Coquis' decision could not be retaliatory because "[t]here is no record support for Plaintiff's allegation that Coquis knew of her 'attempts' to contact a counselor before November 24, 2006," Def. Reply Mem. at 14.  Plaintiff contends otherwise, stating that Coquis "was in Ms. Brooks' office area when Ms. Brooks spoke with EEO Counselor Anita Carey in November 2006."  Pl.'s Opp. Mem. at 21-22.  While the plaintiff's evidence is weak, it still amounts to a material factual dispute that cannot be resolved on this record, particularly when deposition discovery has not been completed.  See *Hamilton*, 2012 WL 119134, at *13 (remanding retaliation claim in employment discrimination suit despite denial by supervisor of knowledge of protected activity, finding that agency's knowledge of protected activity is sufficient at least at prima facie stage).  Since a jury could sustain a finding of retaliation on the current record, summary judgment on the plaintiff's retaliation claim is denied at this time.

### D.        Failure To Accommodate Disability Claims

"[T]he Rehabilitation Act prohibits federal agencies from engaging in employment discrimination against disabled individuals and further requires agencies to make reasonable accommodations for persons with disabilities unless such accommodations would impose undue hardship on the agency." *Klute v. Shinseki*, No. 10-1126, 2012 WL 35599, at *4 (D.D.C. Jan. 9, 2012) (quoting *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 82 (D.D.C. 2009)).  "To determine the appropriate reasonable accommodation, the agency should 'initiate an informal, interactive process with the qualified individual with a disability in need of accommodation.'"  *Loya v. Sebelius*, No. 08-1710, 2012 WL 52265, at *9 (D.D.C. Jan. 10, 2012) (quoting 29 C.F.R. § 1630.2(o)(3)).  "'[A]n employer is not required to provide an employee that accommodation [s]he requests or prefers, the employer need only provide some reasonable accommodation.'"  *Id.* (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1305 (D.C. Cir. 1998) (en banc)).

"To establish a prima facie case of discrimination under the Rehabilitation Act for an employer's failure to reasonably accommodate a disability, a plaintiff must show (1) that she was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of her disability; (3) that with reasonable accommodation she could perform the essential functions of the position; and (4) that the employer refused to make the accommodation."  *Id.* (internal quotation marks and alterations omitted).

The defendant argues that the plaintiff has presented insufficient evidence to satisfy her burden of proof that she had a disability within the meaning of the Rehabilitation Act or that the employer had notice of her disability.  This Court agrees.

"An individual is disabled [within the meaning of the Rehabilitation Act] if [she]: (1) has 'a physical or mental impairment that substantially limits one or more of [her] major life

activities,' (2) has 'a record of such impairment,' or (3) has been 'regarded as having such an impairment.'" *Klute*, 2012 WL 35599, at *4 (quoting 42 U.S.C. § 12102(1)); *see also* 29 U.S.C. § 705(20)(B) (incorporating into the Rehabilitation Act the Americans with Disabilities Act's definition of disabled individual).[8]   To be substantially limiting, "an 'impairment's impact must . . . be permanent or long term.'" *Klute*, 2012 WL 35599, at *4 (quoting *Haynes v. Williams*, 392 F.3d 478, 482 (D.C. Cir. 2004) and *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, 198 (2002)).

As described above, the plaintiff contends that she suffered from an eye disability and that she requested reasonable accommodation for her alleged disability on December 15, 2006 and thereafter by requesting that a portion of her duties involving the review of PowerPoint slides created by other managers be reassigned to another employee.  Compl. ¶¶ 37-40; Def.'s SMF ¶¶ 19-21; Pl.'s SMF Resp. ¶¶ 19-21.  The plaintiff's purported request for accommodation on December 15, 2006 occurred in response to an email that Spinale sent expressing criticism of the plaintiff's review of certain PowerPoint ("PPR") slides.  *See* Def.'s Ex. 14.  Spinale sent an email to the plaintiff noting mistakes in PowerPoint slides and stating that "these types of mistakes call all your efforts on the PPR into question and create a sense of unreliability with regard to the final work product." *Id.*  The plaintiff responded to Spinale, copying Coquis, by stating that "Sense [sic] you feel that I create a sense of unreliability in regards to reviewing and

---

[8] The plaintiff does not appear to argue that she qualifies as disabled under either the second or third prong – i.e., that she had a "record" of a disabling impairment or that she was "regarded as having such an impairment." Significant statutory amendments relevant to the definition of "disability" under the Rehabilitation Act and the Americans with Disabilities Act went into effect on January 1, 2009.  *See Lytes v. D.C. Water and Sewer Auth.*, 572 F.3d 936, 939-42 (D.C. Cir. 2009).  These amendments sought to "reject" the Supreme Court's holdings in *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184 (2002), and *Sutton v. United Air Lines*, 527 U.S. 471 (1999).  *Lytes*, 572 F.3d at 939-42.  These amendments, however, are not retroactive and, accordingly, do not apply to the conduct at issue here, which occurred in 2006 and 2007.  *Id.* at 945.

editing your PPR Slides. [sic]  I suggest due to that fact that my chain of command is aware of

that fact that I have been having severe eye problems, that in the future you have someone else to

review the PPR Slides. It is unfortunate that you have been insensitive to my medical condition

and I am forced to point this out to you." *Id.*   The plaintiff later reiterated her request that

another employee review the PowerPoint slides on January 18, 2007, citing her original email

request to Spinale on December 15, 2006.  *Id.*   The plaintiff describes "the occasional review of

PowerPoint slides created by other managers" as a "small portion of her duties."  Pl.'s Opp'n at

10.  The record establishes that the plaintiff's duties otherwise generally required regular use of

email and computers.  *See, e.g.,* Pl.'s Ex. 38 ("Administrative Officer Daily Report January 22,

2007").  The reassignment of the "occasional review" of PowerPoint slides is the only reasonable

accommodation for her alleged disability that the plaintiff ever claims to have requested.

The plaintiff has presented insufficient evidence for a reasonable jury to conclude that

she had "'a physical or mental impairment that substantially limits one or more of [her] major

life activities.'" *Klute*, 2012 WL 35599, at *4 (quoting 42 U.S.C. § 12102(1)).  The Supreme

Court and D.C. Circuit have explained that, for a finding of disability, "a major life activity must

be 'substantially' limited, meaning that the limitation must be 'considerable' or 'specified to a

large degree.'" *Lytes v. District of Columbia Water and Sewer Authority*, 527 F. Supp. 2d 52, 60

(D.D.C. 2007) (quoting *Sutton v. United Air Lines*, 527 U.S. 471, 491 (1999)).  The plaintiff

cannot meet this demanding standard for demonstrating disability.  *See Nurriddin v. Bolden*, 674

F. Supp. 2d 64, 83 (D.D.C. 2009) (noting the Act creates a "demanding standard for qualifying

as disabled") (quoting *Toyota*, 534 U.S. at 197).

The plaintiff contends that her disability affected her "major life activity" of seeing or

vision.   Pl.'s Opp'n at 25.  Yet it is dubious that any disability that substantially limited the

plaintiff's sight would only manifest itself by limiting the plaintiff's ability to review PowerPoint slides, while enabling the plaintiff to otherwise use computers, email, and review documents as part of her job. *See Loya*, 2012 WL 52265, at *9 (noting that a plaintiff must show both that she has a disability within the meaning of the Rehabilitation Act and that with reasonable accommodation she could perform the essential functions of her position). The plaintiff has presented neither evidence nor argument to explain this apparent paradox.

Further, the record is lacking in any medical or other documentation that would demonstrate a disability that substantially limits the major life activity of seeing. The record contains three notes from the plaintiff's eye doctor regarding her eye condition. Two of these notes are from January 2006, nearly a year before the plaintiff's purported request for reasonable accommodation in December 2006. Def.'s Ex. 14 at 10-11. The first note, dated January 20, 2006, stated that the plaintiff's eyes were dilated and that she would have problems focusing for six to twelve hours. Pl.'s Ex. 36. It also stated "Pt is being treated for a serious eye problem & will need to be excused until resolution or able to keep eyes open." *Id.* The second note, dated four days later, January 24, 2006, indicated the plaintiff may return to light duty work. Def. Ex. 14 at 11.

The third doctor's note in the record is dated September 24, 2007, several months after the end of the plaintiff's contract at State, and purports to convey the contents of a prior note allegedly provided to the plaintiff's employer in December 2006. Pl.'s Ex. 35. The prior note is not in the record. The September 24, 2007 note is handwritten and reads, in its entirety: "The following note was given to Ms. Brooks['] Employer in Dec 06: To whom it may concern, Pt Yvonne Brooks is being treated for a chronic severe eye condition (since April 06) that decreases visual acuity. Please keep this in mind when assigning tasks until resolution or improvement

occurs.  Regards, Dr. Kamal [signature]"  Pl.'s Ex. 35.  Even assuming the accuracy of the

information reflected in this note, the Court finds that this note, along with the other two, fails to

establish that the plaintiff had a disability within the meaning of the Rehabilitation Act because,

among other things, it provides no details about the specifics or degree of the limitations the

plaintiff faced.  *See Klute*, 2012 WL 35599, at *4 (noting that the mere existence of impairments

does not constitute disability, but rather the plaintiff must show substantial impairment of a

major life activity).  In fact, if anything, the doctor's note suggests that the plaintiff's "major life

activity" of seeing was not substantially limited, insofar as the note assumed that the plaintiff

would continue working and being "assign[ed] tasks."  Pl.'s Ex. 35.

Thus, there is insufficient record evidence in this case for a reasonable jury to find the

plaintiff had "an impairment that prevent[ed] or severely restrict[ed] the [plaintiff] from doing

activities that are of central importance to most people's daily lives."  *Marshall v. Potter*, 634 F.

Supp. 2d 66, 71 (D.D.C. 2009) (quoting *Toyota*, 534 U.S. at 198).  Accordingly, the Court grants

summary judgment for the defendant on the plaintiff's Rehabilitation Act claim.

## IV.   CONCLUSION

For the reasons explained above, the defendant's motion for summary judgment is

granted in part and denied in part.  Summary judgment is granted for the defendant on the

plaintiff's claims for discrimination (Count II), failure to accommodate disability (Count III), and

hostile work environment (Count IV).  Summary judgment is denied on the plaintiff's claim for

retaliation (Count I).  Pursuant to the Scheduling Order, ECF No. 13, deposition discovery may

now commence on the remaining claim in this action.  The Court will afford the parties 90 days

from the date of this Memorandum Opinion and the accompanying Order for deposition

discovery.  The parties are directed to appear for a status conference after completion of

discovery, on May 4, 2012, to set dates for a pretrial conference and trial.


DATED: January 30, 2012                          /s/  *Beryl A. Howell*

                                                 BERYL A. HOWELL
                                                 United States District Judge