**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| YVONNE M. BROOKS, |
|                  Plaintiff, |
|          v. |
| JOHN F. KERRY, *in his official capacity as* *Secretary of State*, |
|                  Defendant. |

Civil Action No. 10-0646 (BAH)
Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

Pending before the Court are two motions filed by the defendant John Kerry, in his official capacity as Secretary of State,[1] to resolve the remaining claim asserted by the plaintiff Yvonne Brooks, who is an African-American woman, that her contract for employment as an administrative officer for the U.S. Department of State ("State Department") was not renewed upon expiration in March 2007, in retaliation for her seeking Equal Employment Opportunity counseling. *See* Complaint ("Compl.") ¶¶ 41–44 (Count I), ECF No. 1. The plaintiff is seeking damages for this alleged retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., and the Civil Rights Act of 1991, 42 U.S.C. § 1981. *Id.* The Court has already had occasion to consider the factual allegations and claims in this lawsuit and granted summary judgment to the defendant on the plaintiff's claims for race discrimination (Count II), failure to accommodate disability (Count III), and hostile work environment (Count

---

[1] John Kerry, the current Secretary of State, has been automatically substituted as the named defendant in place of Hillary Clinton, who was originally named as the defendant in her official capacity when she served as Secretary of State. FED. R. CIV. P. 25(d).

IV).  *Brooks v. Clinton*, 841 F. Supp. 2d 287, 309 (D.D.C. 2012); Order, *inter alia*, Granting In

Part And Denying In Part Defendant's Motion for Judgment on the Pleadings or for Summary

Judgment, ECF No. 47.  Following a period of almost one and a half years of discovery

requested by the parties on the remaining retaliation claim, the Court now considers the

defendant's Final Motion to Dismiss or for Summary Judgment "on the last remaining issue in

this case, *i.e.,* whether there is sufficient evidence to warrant a jury trial on Plaintiff's retaliation

claim concerning her alleged protected activity on November 16, 2006," Def.'s Final Mot.

Dismiss Summ. J. ("Def.'s Mem."), ECF No. 66, and the defendant's motion to strike as

untimely disclosed two documents attached to the plaintiff's opposition motion, *see* Def.'s

Motion to Strike ("Def.'s Mot. Strike"), ECF No. 75.  For the reasons explained below, both the

defendant's motions are granted.

## I.      BACKGROUND

### A.              Factual Allegations Relating to Retaliation Claim

The Court's prior Memorandum Opinion set out a detailed recitation of the factual

allegations underlying the plaintiff's claims and those will not be repeated here.  *See Brooks*, 841

F. Supp. 2d at 293–96.   The following summary is limited to the facts bearing on the two

pending motions.

The plaintiff began working, in November 2003, as an Administrative Officer, Personnel

Service Contractor to the Management Support Division ("MSD") at the State Department 's

Bureau of Overseas Buildings Operations ("OBO").  Compl. ¶ 11.  Her contract with the State

Department was a one-year contract, with options for renewal in one-year increments for up to

five years.  *See* Def.'s Stmt. of Mat. Facts Not in Dispute ("Def.'s SMF"), ¶ 2, ECF No. 66-1;

*see also* Pl.'s Opp'n. Def.'s Final Mot. Dismiss Summ. J. ("Pl.'s Mot.") Ex. 15 at 7, ECF No. 70-

14 (personal services contract stating the period of performance); Pl.'s Resp. Def.'s SMF ¶ 2, ECF No. 70-29 (noting that the five-year contract could be renewed for another five-year period). The plaintiff's second-line supervisor, Roberto Coquis, was the Contract Officer Representative and ratings official for the plaintiff. Def.'s SMF ¶¶ 5–6. In those capacities, he recommended renewal of the plaintiff's contract two years in a row and gave her an "Outstanding" rating in 2005, an "Excellent" rating in 2006, and a "Satisfactory" rating in 2007, just before her contract expired. *Id*; *see also* Pl.'s Stmt. Of Add'l Mat. Facts In Dispute ("Pl's SMF") ¶ 1; Pl.'s Resp. Def.'s SMF ¶¶ 5–6 (admitting Coquis' approval of contract renewals but disputing, without supportive citations, that the ratings were "provided" by Coquis because plaintiff "earned the ratings through her hard work"). At his deposition, Coquis stated that he "genuinely liked" the plaintiff, Dep. Roberto Coquis ("Coquis Dep.") at 68:11–12, ECF No. 66-2, "felt [she] was a good employee," and noted that he had "hired her twice before and considered her work valuable." *Id*. at 162:8–10.

The plaintiff alleges that, in July 2006, her immediate supervisor was replaced by David Spinale, a white male, and Coquis and Spinale "thereafter began a campaign of hostile work environment and disparate treatment" based on her race and sex, and "failed and refused to accommodate her physical disabilities (Keratitis and Chronic Iritus), a military service-connected disability." Compl. ¶¶ 15–16; *see also* Pl.'s Stmt. Add'l Mat. Facts Dispute ("Pl's SMF") ¶¶ 6–8, ECF No. 70-30.[2] From the perspective of her supervisors, the plaintiff made errors in her

---

[2] As detailed in the Court's prior Memorandum Opinion, the plaintiff cited a number of her supervisors' actions as amounting to a hostile work environment, discrimination, and failure to reasonably accommodate her "severe eye disability," including sending "hostile" emails criticizing her work, charging her leave without pay for two hours, refusing to reimburse her fully for travel expenses to a work-related conference, denying her request to attend a training seminar, requiring her return of a government-issued cell phone, and requiring her to submit daily work reports. *Brooks*, 841 F. Supp. 2d at 293–95 (summarizing Compl. ¶¶ 24–41).

work product, which was repeatedly late, incomplete or inadequate, and this prompted communications to the plaintiff about improving her work on May 24, 2006, *see* Def.'s First Mot. Dismiss Summ. J. Ex. 5 at 1–2, ECF No. 19-10 (email from Coquis to the plaintiff, dated May 24, 2006, listing errors plaintiff made in slide deck and noting, "[a]s stated in the past, the above are the details that you should be reviewing/correcting"); Coquis Dep. At 155:22–156:9; Def.'s SMF ¶ 7; Pl.'s Resp. Def.'s SMF ¶ 7 (without contesting errors in her work product, plaintiff notes her "serious eye disability" that affected her ability to work).

In addition, Coquis became concerned about the plaintiff's use of her work computer. For example, on May 24, 2006, the plaintiff sent an email to Coquis and other State Department personnel entitled "10 Truths Black and Hispanic people know but White people won't admit," that Coquis found "appalling because . . . in addition to referring to . . . whites and black, it also referred to Hispanics. And being Hispanic, I took it personally as discriminatory." Coquis Dep. at 157:1 –5; *see also* Def.'s First Mot. Dismiss Summ. J. Ex. 9, ECF No. 19-14 ("10 Truths" Email from the plaintiff to Coquis and others). Receipt of this email from the plaintiff prompted Coquis to caution her about "*sending out offensive or inappropriate e-mails from your State Email.*"[3] *Id.* (emphasis in original). The plaintiff does not deny sending the 10 Truths email, but contends that this "offense merited only an oral counseling (minimal offense) and therefore cannot serve as the basis for [plaintiff]'s termination." Pl.'s Resp. Def.'s SMF ¶ 8; *see also* Coquis Dep. at 168:3–17 (noting that plaintiff never denied sending the "10 Truths" email).

---

[3] Coquis' email to the plaintiff stated in full: "Yvonne, This e-mail is NOT appropriate to be sent around from your Official State E-mail Address. Additionally, there have been other e-mails ("FW: This is amazing," and Oprah 's Gala) this week that should not be sent from official State Department email. Please refrain from sending out offensive or inappropriate e-mails from your State Email." Def.'s First Mot. Dismiss Summ. J. Ex. 9 at 1–3.

During the summer of 2006, the State Department was undergoing an OBO reorganization and cost savings effort, under the direction of OBO Director General Charles Williams, and this effort entailed closure of SA-18, OBO South, the building where the plaintiff was employed. *See* Suppl. Decl. Wanda L. Mitchell ("Mitchell Suppl. Decl.") ¶¶ 2, 5, ECF No. 66-5; Def.'s SMF ¶ 9. General Williams "encouraged the managers to scrutinize their operations as he was concerned about the functional efficiency of the organization, which he found to be lacking." *See* Decl. Wanda L. Mitchell ("Mitchell Decl.") ¶ 4, ECF No. 66-4. As part of the OBO's cost-saving endeavor, OBO's Director of Human Resources Wanda L. Mitchell discussed the closing of the SA-18 building with Coquis "in about the summer or fall of 2006." Mitchell Suppl. Decl. ¶ 5; Def.'s SMF ¶ 10. Mitchell advised Coquis that "it would be cost efficient" and "the best approach from a [Human Resources ("HR")] standpoint . . . to downsize staff [in SA-18] as employees left their positions." Mitchell Suppl. Decl. ¶ 5. The plaintiff disputes that OBO was downsizing and asserts that more employees were hired after she was terminated. *See* Pl.'s Resp. Def.'s SMF ¶¶ 9, 24. As support for this assertion, the plaintiff relies on the declaration of Dwayne Butler, which is one of the documents that the defendant seeks to strike. *See infra* Part III.A This declaration, by a non-managerial physical security officer, states that "three or four new employees" were hired after the plaintiff was let go, but does not state what positions they were hired for, and does not refute Mitchell's statements about the OBO Director's strategy of downsizing SA-18 through attrition, and ultimately ceasing operations in 2009. Mitchell Suppl. Decl. ¶ 6.

Simultaneously, in the summer or fall of 2006, the Information Technology Department at the OBO ("IT") undertook an initiative to purge "inappropriate images" from the OBO computer system by performing sweeps of employees' computers. *Id.* ¶ 7; Def.'s SMF ¶ 12;

5

Pl.'s Resp. Def.'s SMF ¶ 12 (disputing without supportive citations that a sweep uncovered the image attributed to plaintiff). At the time the effort was initiated, it was determined that "counseling and/or letters of warning" would be issued to employees if inappropriate images were found on their computer, unless "there were egregious violations of Department policies." Mitchell Suppl. Decl. ¶ 7. In early November 2006, this department-wide sweep uncovered an inappropriate image with the file name "Spiderman.jpg" on the plaintiff's computer system as well as evidence that the image had been accessed a number of times using the plaintiff's log-in credentials. *See* Decl. Robert E. Clarke ("Clarke Decl.") at 6, ECF No. 66-7; Coquis Dep. at 57:3–22; 58:16–22; Mitchell Decl. Ex. 4 (letter of warning, dated November 27, 2006, from Coquis to the plaintiff regarding the "Spiderman.jpg" image). The IT Director Song Keller brought the image to Coquis' attention when it was retrieved, and Mitchell recommended that Coquis provide a letter of warning to the plaintiff. Coquis Dep. at 57:9–16; Pl.'s Resp. Def.'s SMF ¶ 13 (disputing without supportive citation that IT brought the email to Coquis' attention). On November 9, 2006, Coquis forwarded Mitchell a draft of the letter of warning for her review and comment before Coquis sent it to the plaintiff. Mitchell Decl. ¶¶ 3, 4; *id.* Ex. 1. Even before Coquis sent the draft letter to Mitchell, the two had already discussed the possibility of not renewing the plaintiff's employment contract. Mitchell Decl. ¶ 4. Coquis submitted the letter of warning to the plaintiff on November 27, 2006. Mitchell Decl. Ex. 4; Pl.'s SMF ¶ 17; Pl.'s Resp. Def.'s SMF ¶ 15 (without contesting issuance of letters, plaintiff notes that the letter was wrongfully issued as the State Department was in a cyber-security grace period).

The plaintiff contends that she did not download or access "Spiderman.jpg" and that she was "exonerated" after the IT department determined that the image was not found in the hard drive of the plaintiff's assigned computer, but on a computer in a different building and on a

different floor than the plaintiff's workstation. *See* Pl.'s SMF ¶¶ 18–19, 21, 27. The documentation on which the plaintiff relies for this contention falls far short of an "exoneration" and instead consists of her emails to the IT department disputing the conclusion that the "Spiderman.jpg" file was on her computer. *See generally* Pl.'s Mot. Ex. 21. Contrary to the plaintiff's assertion, the IT department never cleared the plaintiff of wrongdoing, but rather, upon review of the inappropriate image, informed her that the image was downloaded using her log-in credentials, which "has nothing to do with what computer" the image was found on. Pl.'s Mot. Ex. 21 at 13, ECF No. 70-20 (email, dated February 26, 2007, from Keller to the plaintiff); *see also id.* Ex. 23 at 2–3, ECF No. 70-22 (email, dated February 22, 2007, informing the plaintiff that the directory path for the file included her login information). A second forensic examination of the image undertaken while the parties were in discovery confirmed that the image was located in the plaintiff's "My Documents" subdirectory, which included other personal photographs. Clarke Decl. ¶ 6. The inappropriate file was not located in a temporary internet directory, but "in a directory location that would have required an individual with Ms. Brooks's credentials (username and password) to access and save to." *Id.* In any event, the plaintiff contends that she should never have received the letter of warning at all because the State Department was "in a cyber-security grace period." Pl.'s Resp. Def.'s SMF ¶ 15 (citing Pl.'s Mot. Ex. 26, ECF No. 70-25 (email dated November 28, 2006, from Cyber Security Incident Program Adjudicator to the plaintiff)). The "grace period" cited by the plaintiff only prevented such incidents from being "entered into [the plaintiff's] permanent incident history record." *See id*; *see also* Pl.'s Mot. Ex. 26. This does not, as the plaintiff assumes, preclude supervisors from issuing letters of warning.

Prior to sending the letter of warning, Coquis also reviewed a snapshot file of the plaintiff's computer inbox provided to Coquis by the IT Department in response to a request he had made on June 20, 2006, shortly after receiving the plaintiff's "10 Truths" email. See Def.'s SMF ¶ 13; Coquis Dep. at 65:21–66:5; Pl.'s SMF ¶ 15. Coquis explained that although he had briefly "scanned" the snapshot when he first received it, he did not look closely at it because he "didn't think it was necessary at the time." *Id.* at 66:3–15. He revisited the snapshot of the plaintiff's email inbox after seeing the "Spiderman.jpg" image "to see if there was more" in her inbox. *Id.* at 63:14–21. Upon close examination of the snapshot, Coquis found other inappropriate images in the plaintiff's inbox. Def.'s SMF ¶ 13; Coquis Dep. at 61:16–63:21. This discovery "did impact [Coquis'] decision not to renew the plaintiff's contract." Coquis Dep. at 93:8–9; *id.* at 163:17–19; Def.'s SMF ¶ 14; Pl.'s Resp. Def.'s SMF ¶ 14 (without contesting Coquis' decision upon reviewing the file, plaintiff notes that Coquis did not tell anyone of his final termination decision until February 1, 2007); Pl.'s SMF ¶ 20 (alleging Coquis "terminated" plaintiff's employment contract). He explained that this was not a decision he made "overnight" but had considered for at least a month. *Id.* 93:9–19 (testifying that "the decision . . . started to bubble up in October"); *id.* 163:20–164:2 (testifying that "this was not a decision that was made overnight in November, this was a decision that was made over time, at least several weeks if not a month, in the making"). According to Coquis, as early as October 24, 2006, he considered nonrenewal of the plaintiff's employment contract when he denied her request to attend training from January to March, 2007. *Id.* 93:8–16. On November 24, 2006, Coquis submitted an email to the HR department, including Mitchell, stating that he had "come across more information that has influenced [him] towards not renewing [the plaintiff's] contract in April of 2007." Mitchell Decl. Ex. 3; *See Brooks*, 841 F. Supp. 2d at 305.

Coquis notified the plaintiff on February 1, 2007, that her contract would not be renewed. Def.'s SMF ¶¶ 15–16; *see also* Pl.'s Mot. Ex. 22, ECF No. 70-21 (email, dated February 1, 2007, from Coquis to the plaintiff confirming nonrenewal of contract); Pl.'s Resp. Def.'s SMF ¶¶ 16, 17. Thereafter, Coquis was informed that the IT department had located a second inappropriate image on the plaintiff's computer system with the file name "FETAL-9WEEKSABORT[1].jpg", which had been saved to a State Department computer hard drive and subsequently accessed using the plaintiff's log-in credentials. Coquis Dep. at 68:13–69:22; Pl.'s Mot. Ex. 20, ECF No. 70-19 (letter of warning, dated November 27, 2007, from Coquis to the plaintiff). Upon Mitchell's recommendation, Coquis issued a second letter of warning to the plaintiff on February 27, 2007. *Id.*; Coquis Dep. at 68:13–69:22.

The plaintiff's contract was allowed to expire on March 31, 2007. Def.'s SMF ¶¶ 15–16; Coquis Dep. at 94:18–95:6; Pl.'s Resp. Def.'s SMF ¶ 16 (without contesting that Coquis gave 60 days' notice, plaintiff notes without supportive citation that Coquis terminated her contract on February 1, 2007). Coquis stated that he did not renew the plaintiff's contract "[b]ased on her performance, and based on the restructuring of our organization," *id.* at 86:8–10, which included closing SA-18, where the plaintiff was employed, *id.* at 171:5–7. The plaintiff filed her EEO complaint on May 13, 2007. Def.'s SMF ¶ 17; Def.'s Reply Pl.'s Opp'n Final Mot. Dismiss Summ. J. After Dep. Disc. Ex. 1 ("EEO Counselor's Report") at 9, ECF No. 76-2. The plaintiff filed the instant suit on April 26, 2010. *See generally* Compl.

### B.     The Court's Prior Decision Regarding the Plaintiff's Retaliation Claim

During the first round of dispositive motion briefing, before discovery was completed, the defendant sought dismissal or summary judgment of the plaintiff's retaliation claim in Count I of the Complaint on the ground that the plaintiff failed to establish causation. According to the

defendant, Coquis made his decision not to renew the plaintiff's contract in November 2006, prior to the dates the plaintiff alleges she engaged in EEO activity. *See Brooks*, 841 F. Supp. 2d at 295, 304. These dates were January 26, 2007, when the plaintiff sent a memorandum to General Charles Williams titled "MSD EEO Complaint," and March 13, 2007, when the plaintiff sought EEO counseling. *Id.* The defendant also moved for dismissal or summary judgment of the remaining three counts on grounds of failure to exhaust administrative remedies with respect to the race discrimination claim (Count II), and failure to state a claim, under Federal Rule of Civil Procedure 12(b)(6), with respect to the disability claim (Count III), and hostile work environment claim (Count IV). *Id.* After converting the defendant's motion into a motion for summary judgment, judgment was granted in favor of the defendant on Counts II–IV, *id.* at 309, but denied on the plaintiff's retaliation claim, *id.* at 306. While the Court credited that Coquis decided not to renew the plaintiff's contract on November 24, 2006, *id.* at 303–04, the plaintiff claimed to have engaged in protected activity shortly before the date. Specifically, the plaintiff stated "that she previously complained to an EEO counselor, Anita Cary, about her EEO claims on November 16, 2006," *id.* at 304 (citing Pl.'s Resp. Def.'s SMF ¶ 22), as corroborated by statements she had made in two EEO Counselor's report that she has "been trying to file an EEO Complaint since November 2006" and "initially informed Anita Carey [sic] EEO Representative of [her] harassment and hostile working conditions." *Id.* at 304–05. The Court found that "the plaintiff's evidence amounts to little more than her bare assertion with only limited corroboration," and that the evidentiary support of this claim "is indeed thin." *Id.* at 305. Yet, the Court held that the allegations and evidence were "sufficient to save her retaliation claim from summary judgment," *id.*, based on the temporal proximity of the alleged November 16, 2006 meeting between the plaintiff and Cary, and Coquis' "cryptic non-renewal decision eight

10

days later alluding to" "new information" that led to this decision. *Id.* at 305–06. Although the defendant claimed there was no record support that Coquis was aware of the plaintiff's alleged attempts to contact an EEO counselor before making his decision, the plaintiff stated that Coquis had observed her meeting with Cary. *Id.* at 306. Despite finding that "the plaintiff's evidence is weak," based on the extant record before the court, for which deposition discovery had not been completed, the Court concluded that a "jury could sustain a finding of retaliation." *Id.*

The Court afforded the parties ninety days from the date of the opinion to conduct deposition discovery for the plaintiff's remaining retaliation claim. *Id.* at 30–31. The ninety days stretched to 469 days after the parties' nine requests to extend the period for deposition discovery were granted. *See* 4/25/2011 Minute Order; 6/15/2012 Minute Order; 7/24/2012 Minute Order; 10/12/2012 Minute Order; 11/09/2012 Minute Order; 12/12/2012 Minute Order; 1/28/2012 Minute Order; 2/22/2013 Minute Order (amended in 2/25/2013 Minute Order); 4/01/2013 Minute Order (ordering the close of discovery on May 13, 2013).

At the end of the discovery period, the defendant filed the second instant motion to dismiss or, alternatively, for summary judgment on the plaintiff's remaining retaliation claim. *See generally* Def.'s Mem. In opposition, the plaintiff filed two documents, which the defendant claims the plaintiff failed previously to produce or identify and are the subject of the defendant's pending motion to strike. *See* Def.'s Mot. Strike at 1, 5. These documents are: (1) a declaration by Dwayne Butler, a former physical security officer at the State Department, who states that he observed the plaintiff meet with EEO counselor Cary on November 15, 2006, *see* Declaration of Dwayne Butler ("Butler Decl."), ECF No. 70-10, and (2) a one-page document labeled "HARASSMENT," which appears to list a series of emails or instances of harassment. *Id.* Ex. 12 at 7, ECF No. 70-12. The defendant's motions are currently before the Court.

## C.    Plaintiff's Disputed EEO Meeting in November, 2006

The crux of the plaintiff's retaliation claim is that her contract was not renewed in retaliation for her engagement in protected activities, and not because of the quality of her work, a reorganization of the section in which she was employed, or her purported inappropriate use of State Department computers, which prompted a cautionary warning in May, 2006 and two disciplinary letters in November, 2006, and February, 2007.  The Complaint refers to the following dates when the plaintiff "felt forced to file an EEO complaint against her manager, Roberto Coquis," Compl. ¶ 17:  February 6 and 16, 2007, and March 28, 2007, on which dates the plaintiff alleges that she "informed Mr. Coquis and Mr. Coquis' supervisor, General Charles Williams, of the hostile work environment, discrimination, failure to accommodate, and reprisal," *id*. ¶ 18; *see also id*. ¶ 32L.[4]  The only contact with an EEO representative mentioned in the Complaint is the plaintiff's allegation that she filed her formal EEO complaint with the State Department on March 13, 2007.  *Id*. ¶ 8.  The plaintiff stated in this EEO complaint that she

---

[4] The Complaint also refers to the plaintiff's "protected activity when, on several occasions throughout March 28 to September 2006, [plaintiff] complained directly to Mr. Coquis, MSD Director, of the harassment and hostile work environment." Compl. ¶ 19.  In the first round of dispositive motion briefing, the plaintiff did not point to her informal complaints to Coquis as the trigger for the alleged retaliation.  In this round of briefing, the plaintiff alleges in her dispute of the defendant's statement of material facts, that her protected activity extends to emails where she sought accommodation for her eye condition, keratitis, and for complaining generally to supervisors regarding "harassment and hostile work environment."  *See* Pl.'s Resp. Def.'s SMF ¶ 18; Pl.'s SMF ¶ 9–14.  Only one of the emails that the plaintiff relies on both complains of alleged harassment and precedes the date Coquis decided not to renew the plaintiff's contract.  *See* Pl.'s Mot. Ex. 12, ECF No. 70-12; *id.* Ex. 13, ECF No. 70-13.  Review of the entire email thread, in which the plaintiff states to Coquis that she "feel[s] as thou [sic] [she is] being harassed," Pl.'s Mot. Ex. 12 at 5, does not suggest that the plaintiff was complaining of discrimination, but only disagreeing with her supervisors' appraisal of her work.  *See id.* (email, dated October 10, 2006, from Brooks to Coquis).  Notably, the email made no mention of race.  Thus, it cannot reasonably be considered an EEO-protected activity that could give rise to retaliatory acts.  *See Peters v. D.C.*, 873 F. Supp. 2d 158, 202 (D.D.C. 2012) (finding that plaintiffs' complaints that they were assigned too many cases and were penalized for a backlog, when other workers were not, failed to plead discrimination based on race); *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 77 (D.D.C. 2007) ("While no 'magic words' are required" to mark an exchange as protected activity, the employee "must in some way allege unlawful discrimination." (quoting *Broderick v. Donaldson,* 437 F.3d 1226, 1232 (D.C. Cir. 2006))).

had "been trying to file an EEO Complaint since November 2006." EEO Counselor's Report at 9.

During the first round of dispositive briefing, the plaintiff raised, for the first time, in her opposition motion that she engaged in EEO protected activity before November 24, 2006, asserting that she met with Cary on November 16, 2006. *See* Pl.'s First Mem. Opp'n Def.'s Mot. Dismiss Summ. J. ("Pl.'s First Opp'n") at 21, ECF No. 30. After the parties proceeded to discovery, the plaintiff was deposed and twice confirmed that she had met with Cary on November 16, 2006. Dep. Tr. Yvonne Brooks ("Brooks Dep.") at 18:20–21, 21:8–10. She testified that on this date she had a "face to face" meeting with Anita Cary, an EEO Counselor, to discuss a discrimination claim based on "[b]eing treated differently," *id.* at 17:2–22, ECF No. 66-3, and "constant harassment," *id.* at 18:1, in relation to her job performance, *id.* at 17:2–25. The plaintiff alleges that the meeting took place in the plaintiff's office, *id.* at 21:21, which is in the OBO South building, Compl. ¶ 11. The plaintiff recalled seeing Coquis "looking in [her] office" and seeing her "talking to the EEO representative," Anita Cary. Brooks Dep. at 30:18–20; *see also id.* at 30:21–23 (plaintiff testifying that Coquis was aware of her EEO-protected activity because she had observed "[h]im seeing [Cary] in [the plaintiff's] office."). The plaintiff did not send any emails or written confirmation to Cary confirming that the meeting took place. *Id.* at 21:24–25, 22:1–10. She states that she recalls the date of the meeting on November 16, 2006, because she "must have written it down," but no such documentation has been presented or discussed by the plaintiff. Brooks Dep. at 18:21. The plaintiff additionally testified that she called Cary in December to set up a meeting to speak. *Id.* at 22:15–18.

The plaintiff has since revised the date of this meeting to November 15, 2006.[5]  *See* Pl.'s

Mem. Opp. Def.'s Final Mot. Dismiss Alt. Summ. J. ("Pl.'s Opp'n") at 7, ECF No. 72 (stating

that the meeting with Cary took place on November 15, 2006).  She now submits as Exhibit 9 to

her opposition to the instant motion the declaration of Dwayne Butler, a former security officer

at the OBO, who seemingly corroborates the plaintiff's account of this meeting.  *See generally*

Butler Decl.  The plaintiff does not discuss this newly-uncovered witness but merely cites to the

declaration in her opposition papers, *id.* at 3, 7, 8, 19, 20, 21, and in her statement of additional

material facts in dispute.  Pl.'s SMF ¶¶ 12–14, 24; *see generally* Pl.'s Opp'n.[6]  Butler states in

the declaration that he has been a physical security officer for over ten years and worked in OBO

South at the State Department adjacent to the plaintiff's office.  Butler Decl. ¶¶ 1, 3, 7.  He

claims that "Coquis is [his] second line supervisor and has been so since [he] was hired." *Id.* ¶ 2.

He confirms that Coquis was not located in OBO South but worked in the SA 6 State annex in

Rosslyn, VA.  *Id.* ¶ 5.  Butler states that on November 15, 2006, he "observed Anita Carey in

[the plaintiff's] office having a conversation with" the plaintiff through the glass front of her

office.  *Id.* ¶¶ 12, 13.  He further states that he viewed Coquis "directly outside [the plaintiff's]

office, watching [the plaintiff] through the glass front, as she spoke to Anita Carey."  *Id.* ¶ 14.

Whether the meeting took place on November 15 or 16, 2006, has no bearing on the

defendant's argument, which is: that this meeting did not take place at all; the meeting was not

---

[5] It is not clear from the record when, but at some point during discovery, it appears that November 15, 2006, was the alleged date of this meeting, as Coquis was questioned during his deposition whether he observed the plaintiff's meeting with Cary take place "on November 15th."  *See* Coquis Dep. at 77:12–17.

[6] The Court recognizes that there is a discrepancy in the alleged declarant's name.  The defendant points out that this declarant, a former State Department employee, spells his name "DeWayne Butler," not "Dwayne Butler," as stated in the declaration.  Def.'s Mem. at 5. Without reaching a conclusion as to the declarant's actual name, the Court will refer to the declarant using the name provided in the declaration.  According to the defendant, this inconsistency is but one of several indicia that undermines the credibility of this declaration.  *See infra* Part III.A.

observed by Coquis; Coquis did not know who Cary was at the time; and, if such a meeting did in fact occur, it must have occurred in the first week of December, after Coquis had already decided not to renew the plaintiff's contract. *See generally* Def.'s Mem.

In Cary's deposition, she states that she does not remember having a meeting with the plaintiff in November, but that she had a "brief encounter," Dep. Anita Cary ("Cary Dep.") at 58:4, ECF No. 66-6, with the plaintiff during an "annual inservice training, which was from December the 4th through December the 8th of 2006." *Id.* at 54:17–19; *id.* at 26–30 (agenda of conference in OBO South from December 4–8, 2006). Cary stated that the two met in the plaintiff's workspace in OBO South in December, but that they "didn't talk very long at all" and it "didn't seem as if [the plaintiff] wanted to proceed or do anything." *Id.* at 55:5–22. Cary testified that she must have met with the plaintiff during this week because "that's the only time" Cary, *id.* at 62:9–10, whose office was located in Rosslyn, *id.* at 41:10–12, would have been in OBO South, because she "had no other reason to be [in OBO South] for anything," *id.* at 62:9–13. Cary testified that Coquis would not have been at the inservice training in December. *Id.* at 58:13–15. Cary testified that she did not have any record in her calendar of a meeting with the plaintiff in November or December, *id.* at 109:3–16, and no "recollection of having a conversation on the phone" with the plaintiff, *id.* at 99:1–15, and that she would usually recollect such a conversation, record it on her calendar, and notify the Office of Civil Rights. *Id.* at 109:3–16; 99:1–15. She also testified that when she meets with someone, they are given "a copy of a notice of rights and responsibilities" that the parties review and "on the last page, [Cary] and the aggrieved have to sign and date it." *Id.* at 103:11–18. She did not review this notice with the plaintiff when they "brief[ly]" met in December. *Id.* at 106:7–9.

15

Coquis, whose office is in Rosslyn and not in the OBO South building in Springfield, Virginia, Coquis Dep. at 72:21–73:1; 75:15–17; Cary Dep. at 41:10–12; Cary Dep. at 26–30, does not recall being in the plaintiff's office building when this counseling meeting allegedly took place "on November 15th or thereabouts." *Id.* 73:9–22. He testified that he "did not spend a lot of time down at OBO South." *Id.* 78:21–22. Notably, he further stated in his deposition that he did not even know that Cary was an EEO representative. *Id.* 75:21–76:3. He denies that "[o]n November 15, 2006," he "observe[d] Ms. Cary in a meeting with" the plaintiff or "observe[d] Ms. Cary in [the plaintiff's] office." *Id.* 77:12–17.

The only evidence corroborating the plaintiff's claim that her meeting with Cary occurred in November 2006 before Coquis decided to fire her is the Butler declaration, which the defendant has now moved to strike.

## II.    LEGAL STANDARD

### A.    Conversion to Motion for Summary Judgment

The defendant has moved, pursuant to Federal Rule of Civil Procedure 12(b)(6), for dismissal, or, alternatively, for summary judgment, pursuant to Federal Rule of Civil Procedure 56 on the plaintiff's retaliation claim. The Federal Rules of Civil Procedure provide that if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment," and if a motion is so converted, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." FED. R. CIV. P. 12(d). The Circuit reviews a district court's decision to convert a motion to dismiss into a summary judgment motion for an abuse of discretion. *Colbert v. Potter*, 471 F.3d 158, 164–65 (D.C. Cir. 2006); *Flynn v. Tiede–Zoeller, Inc.,* 412 F. Supp. 2d 46, 50 (D.D.C. 2006) ("The decision to convert a motion to dismiss into a motion for summary judgment . . . is committed to

the sound discretion of the trial court.").  In using this discretion, "the reviewing court must assure itself that summary judgment treatment would be fair to both parties."  *Tele–Commc'ns of Key W., Inc. v. United States,* 757 F.2d 1330, 1334 (D.C. Cir. 1985).  Therefore, "[i]n converting the motion, district courts must provide the parties with notice and an opportunity to present evidence in support of their respective positions."  *Kim v. United States,* 632 F.3d 713, 719 (D.C. Cir. 2011).

If extra-pleading evidence "is comprehensive and will enable a rational determination of a summary judgment motion," a district court will be more likely to convert to summary judgment, but "when it is scanty, incomplete, or inconclusive," the district court is more likely to decline to convert to summary judgment and permit further discovery.  *See* 5C CHARLES ALAN WRIGHT, *ET AL.,* FEDERAL PRACTICE & PROCEDURE ("WRIGHT & MILLER") § 1366 (3d ed. 2012).  Thus, there is no bright-line threshold for conversion under Rule 12(d); the touchstone is fairness and whether consideration of summary judgment is appropriate, in light of the nature of the extra-pleading material submitted, the parties' access to sources of proof, and the parties' concomitant opportunity to present evidence in support or opposition to summary judgment.  In light of the substantial extra-pleading evidence that has been submitted and the ample time afforded the parties to access sources of proof, the Court will consider matters beyond the pleadings and treat the defendant's motion as one for summary judgment.

## B.  Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Summary judgment is properly granted against a party who, "after adequate time for discovery and upon motion, . . . fails to

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party to demonstrate that there is an "absence of a genuine issue of material fact" in dispute. *Id*. at 323.

In ruling on a motion for summary judgment, the Court must draw all justifiable inferences in favor of the nonmoving party and shall accept the nonmoving party's evidence as true. *Anderson v. Liberty Lobby, Inc*. ("*Liberty Lobby*"), 477 U.S. 242, 255 (1986). The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3). For a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, see *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* FED. R. CIV. P. 56(e). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *See, e.g.*, FED. R. CIV. P. 56(c)(1); *Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (noting that at summary judgment stage, plaintiff "can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' . . . which for purposes of the summary judgment motion will be taken to be true.'" (quoting *Sierra Club v. EPA*, 292 F.3d 895, 898–99 (D.C. Cir. 2002) (ellipsis and second alteration in original))). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted).

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. In that situation, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* Notably, "[s]elf-serving testimony does not create genuine issues of material fact, especially where that very testimony suggests that corroborating evidence should be readily available." *Fields v. Office of Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007). Additionally, "on summary judgment, statements that are impermissible hearsay or that are not based on personal knowledge are precluded from consideration by the Court." *Riggsbee v. Diversity Servs., Inc.*, 637 F. Supp. 2d 39, 46 (D.D.C. 2009); *accord* FED. R. CIV. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (holding that "[v]erdicts cannot rest on inadmissible evidence" and "sheer hearsay . . . therefore counts for nothing" at summary judgment).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury," however, "is as much art as science." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011). Particularly in a case such as this where the non-moving party relies almost entirely upon her own generally corroborated statements in depositions, declarations, and interrogatory responses to create a genuine issue of material fact, the Court must carefully assess whether the plaintiff's evidence is "merely colorable," *Liberty Lobby*, 477 U.S. at 249, or whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party," *id*. at 248.  The Court must review the record "taken as a whole."  *Reeves v. Sanderson*

*Plumbing Products, Inc.*, 530 U.S. 133, 150–51 (2000) (quoting *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  On the one hand, the Court must accept all of

the non-movant's evidence as true and give her the benefit of all justifiable inferences. *See id*. at

255.  The Court may not make credibility determinations or weigh the evidence, *Reeves*, 530

U.S. at 150, as "[c]redibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge."  *Id.* (quoting *Liberty*

*Lobby*, 477 U.S. at 255).  On the other hand, a non-movant's allegations that are "generalized,

conclusory and uncorroborated by any evidence other than the [non-movant's] own deposition

testimony" are "insufficient to establish a triable issue of fact"—at least where the nature of the

purported factual dispute reasonably suggests that corroborating evidence should be available.

*See Akridge v. Gallaudet Univ*., 729 F. Supp. 2d 172, 183 (D.D.C. 2010); see also *GE v. Jackson*,

595 F. Supp. 2d 8, 36 (D.D.C. 2009) (observing that when a "declaration is self-serving and

uncorroborated" it is "of little value at the summary judgment stage").

## III.    DISCUSSION

Pending before the Court are the defendant's motions for summary judgment and to

strike two of the plaintiff's exhibits attached to her opposition.  As described below, the

resolution of the motion to strike directly bears upon the resolution of the summary judgment

motion.  Accordingly, the Court will begin by discussing the defendant's motion to strike before

addressing the defendant's summary judgment motion.

### A.    Motion to Strike

The defendant has moved to strike two previously-undisclosed documents attached to the

plaintiff's opposition, claiming that the plaintiff has failed to disclose these to the defendant

pursuant to its obligation under Federal Rule of Civil Procedure 26, and that this omission is not "substantially justified" or "harmless" under Rule 37, warranting exclusion of both documents. *See* FED. R. CIV. P. 26, 37; Def.'s Mot. Strike at 5–7.  The plaintiff does not dispute that these exhibits were not disclosed during discovery, but instead responds that disclosure of the Butler Declaration was not required under Rule 26 because the declaration is intended solely for impeachment purposes and "does not attempt to establish any new facts."  *See* Pl.'s Opp'n Def.'s Mot. Strike ("Pl.'s Opp'n Mot. Strike") at 1–2, ECF No. 80.  The plaintiff further argues that even if disclosure were required, the declaration should not be excluded because the disclosure posed "no surprise to Defendant" who "would have known of [the declarant's existence] as its employee."  Pl.'s Opp'n Mot. Strike at 4.  The plaintiff is silent with respect to the second document, which is a single page titled "HARASSMENT," providing neither a defense nor an explanation for this undated, anonymously authored document which appears on page 7 of Exhibit 12 in the plaintiff's opposition motion.  Accordingly, because the plaintiff has not responded to the defendant's challenge to the "HARASSMENT" document, the defendant's motion to strike this document is granted as conceded, and the one-page document will be struck from Exhibit 12 of the plaintiff's opposition.  *See Schneider v. Kissinger,* 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) (finding that arguments that the plaintiff does not address may be treated as conceded).  The Court now turns to the dispute over the challenged Butler declaration.

As noted, the first document the defendant seeks to strike is the disputed Butler Declaration, which is a signed statement dated September 25, 2013, by a State Department physical security officer intended to corroborate the plaintiff's testimony that she met on November 15, 2006, with Cary and that Coquis observed them.  Butler states that he "observed Anita Carey [sic] in [the plaintiff's] Office having a conversation with" the plaintiff, Butler Decl.

¶¶ 12–13, and further that he was not the only person watching the two women meet because he "observed Roberto Coquis directly outside Ms. Brook's [sic] office, watching her through the glass front, as she spoke to Anita Carey [sic]," *id.* ¶ 14. As the defendant points out, this declaration by Butler, an undisclosed witness, "was only obtained five days prior to the filing of [the plaintiff's] Opposition, almost seven years after the events that he allegedly witnessed." Def.'s Mot. Strike at 7.

"[D]istrict courts have 'broad discretion in structuring discovery.'" *Hussain v. Nicholson*, 435 F.3d 359, 363–64 (D.C. Cir. 2006) (quoting *Edmond v. U.S. Postal Serv. Gen. Counsel,* 949 F.2d 415, 425 (D.C. Cir. 1991)). Consequently, "[t]he decision to grant or deny a motion to strike is vested in the trial judge's sound discretion." *Canady v. Erbe Elektromedizin GmbH,* 384 F. Supp. 2d 176, 180 (D.D.C. 2005); *see also Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007) (recognizing that district courts have broad discretion over discovery); *Hussain,* 435 F.3d at 363 (same); *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 150 (D.C. Cir. 1996) (holding that Circuit reviews trial court's determination of motion to strike for abuse of discretion).

1. *Failure to Disclose Witness Under Rule 26*

Under the Federal Rules of Civil Procedure, parties are required to provide to the opposing party, without "awaiting a discovery request," the contact information of "each individual likely to have discoverable information" in their initial disclosures. FED. R. CIV. P. 26(a)(1)(A); *see also* FED. R. CIV. P. 26(b)(1) (scope of discovery under Rule 26(b) includes "the identity and location of persons who know of any discoverable matter."). Rule 26 further requires a party to "supplement" any disclosure made under Rule 26(a) "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional

or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." FED. R. CIV. P. 26(e)(1).

Generally, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial." FED. R. CIV. P. 37(c). Exclusion is not appropriate, however, when "the failure was substantially justified or is harmless." *Id.* A court is also vested with discretion to impose other sanctions, such as "order[ing] payment of the reasonable expenses, including attorneys' fees, caused by the failure," which may be ordered "[i]n addition to or instead of" the sanction of exclusion. *Id.* The phrase "substantially justified" is generally interpreted to mean "'justified in substance or in the main'—that is, justified to a degree that could satisfy a reasonable person." *See Pierce v. Underwood,* 487 U.S. 552, 565 (1988). The advisory committee's commentary to Rule 37(c) indicates that exclusion is a "self-executing sanction," and that "[l]imiting the automatic sanction to violations 'without substantial justification,' . . . is needed to avoid unduly harsh penalties in a variety of situations." *See* FED. R. CIV. P. 37(c) advisory committee's note (1993 Amendments). The advisory committee note goes on to list examples of situations in which violations would be "substantially justified" or "harmless," which include: "the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties; the failure to list as a trial witness a person so listed by another party; or the lack of knowledge of a pro se litigant of the requirement to make disclosures." *Id.*

Rule 56 clearly contemplates the submission of declarations in support of summary judgment. FED. R. CIV. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence,

and show that the affiant or declarant is competent to testify on the matters stated."). The rule only sets forth the requirements for an affidavit or declaration submitted in support of or opposition to a motion for summary judgment, however; "it does not impart any 'right' to submit such affidavits or declarations." *Wannall v. Honeywell Int'l, Inc.*, 292 F.R.D. 26, 34 (D.D.C. 2013). The important consideration in deciding a motion to strike an affidavit "filed in response to a motion for summary judgment" is "whether the affidavit contradicts a prior sworn statement without justification or the filing party breached its obligations in discovery," *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007).

In this case, it is clear that the disclosure of the declaration is untimely under Rule 26. The plaintiff never identified Butler as a possible witness in her initial Rule 26(a) disclosures. *See* Def.'s Mot. Strike Ex. 4 at 2–5, ECF No. 75-4. Discovery closed on May 13, 2013. *See* 4/1/2013 Minute Order. At no point before the close of discovery did the plaintiff inform the defendant that she had found Butler, who would be able to provide corroboration for the plaintiff's claimed meeting with EEO Representative Cary in November, 2006, the evidence of which the Court had initially found was "weak." *Brooks*, 841 F. Supp. 2d at 306; *see also* Def.'s Mot. Strike at 3. Nor did the plaintiff seek leave to extend the discovery period to accommodate the late disclosure and deposition of Butler. Instead, the plaintiff simply introduced this declarant by including his statement as Exhibit 9 in her opposition to the defendant's instant motion for summary judgment, without further discussion or explanation. *See generally* Butler Decl. The plaintiff cites the Butler Declaration in support of her contention that she complained of harassment to the EEO counselor Anita Cary on November 15, 2006, Pl.'s Opp'n at 7, and that Coquis "observed Ms. Brooks speaking with . . . Cary," *id.* at 19; *see also id.* at 8, 20 (citing to "Exhibit 9," the Butler Declaration, for support that Coquis hired additional employees after

the plaintiff was terminated). The plaintiff also cites to this exhibit in her response to the defendant's statement of material facts not in dispute to support her contention that her first EEO counseling meeting with Cary occurred in November. *See* Pl.'s Resp. Def.'s SMF ¶ 18, ECF No. 70-29. As the defendant points out, the "[p]laintiff has never acknowledged that Mr. Butler has been belatedly introduced into this litigation, much less offered an explanation for why a declaration from him was only obtained five days prior to the filing of her Opposition . . . ." Def.'s Mot. to Strike at 3. The plaintiff responds that the declaration is merely used to impeach the testimony of Anita Cary and, thus, need not be disclosed under Rule 26(a)(1)(A)(i) (requiring disclosure of individuals with discoverable information "unless the use would be solely for impeachment"). This argument fails because it is evident that the declaration is not being offered as impeachment evidence, but to address the weakness identified in the Court's prior decision by corroborating the timing of the plaintiff's claimed meeting with EEO representative Anita Cary in November 2006.

Specifically, the import of this date was not lost on either party—this Court denied the defendant summary judgment on the plaintiff's retaliation claim because the plaintiff had sufficiently alleged the causal element for the plaintiff's retaliation claim and raised an issue regarding the timing of her protected activity, while noting the weakness of the plaintiff's evidence that this meeting did, indeed, occur on November 16, 2006. *Brooks,* 841 F. Supp. 2d at 303–06. As the defendant points out, "[i]t strains credulity to think that Plaintiff, who has litigated this matter for more than two years, would not appreciate the relevance of a potential witness or person having knowledge of the facts of her case." Def.'s Mot. Strike at 7. The Butler declaration is offered to establish both that this meeting occurred, and that Coquis observed this meeting. *See* Butler Decl. These two facts are necessary to bolster the plaintiff's

retaliation claim, not merely because it will impeach witnesses who refute that this meeting ever took place. *See Elion v. Jackson*, 544 F. Supp. 2d 1, 6–7 (D.D.C. 2008) (finding that testimony was not offered "solely for impeachment purposes" and, thus, had to be disclosed under Rule 26(a) where the testimony was used "to rebut an inference about the facts of this case"); *see also Chiasson v. Zapata Gulf Marine Corp.,* 988 F.2d 513, 517 (5th Cir. 1993) (substantive evidence is evidence "offered to establish the truth of a matter to be determined by the trier of fact" while impeachment evidence is evidence offered to "discredit a witness") (internal quotation marks and citation omitted).[7]  The declaration corroborates facts necessary to bolster the plaintiff's retaliation claim and push it beyond the "merely colorable" range.  *See Liberty Lobby*, 477 U.S. at 249.  Accordingly, it cannot be said to be "solely for impeachment" purposes.  Consequently, the plaintiff was obliged to disclose Butler as a witness under Rule 26.

---

[7] The plaintiff relies on two cases outside of this jurisdiction to support her argument that, assuming Butler is an impeachment witness, the plaintiff was under no obligation to disclose him because the defendant did not "specifically request for the disclosure of impeachment witnesses" in its discovery request, and "Rule 26(b)'s discovery disclosure requirement is triggered only in 'response to a specific discovery request.'"  Pl.'s Opp'n Mot. Strike at 3 (citing *Morris v. Metals USA*, 2:09-CV-1267-DCN, 2011 WL 94559 (D.S.C. Jan. 11, 2011), and *Newsome v. Penske Truck Leasing Corp.*, 437 F. Supp. 2d 431, 438 (D. Md. 2006)).  These two cases are inapposite because the non-disclosure exception articulated in those cases applies only to impeaching witnesses, which is not the nature of Butler's declaration here.  As these referenced cases point out, if a witness's testimony is used for its substance, the witness's identity must be disclosed.  *See Morris*, 2011 WL 94559 at *1 (finding that witness's testimony was substantive and ordering exclusion of the undisclosed witness's testimony at trial where witness was not previously disclosed); *Newsome*, 437 F. Supp. 2d at 436 (finding that witness's testimony was substantive and ordering disclosure of the testimony to the other party); *see also* FED. R. CIV. P. 26(A) ("[A] party must, without awaiting a discovery request, provide to the other parties" the name and contact information of witnesses with likely discoverable information).  The plaintiff here fails to heed the *Newsome* court's caution:

> A party erroneously designating evidence as "impeachment evidence" to prevent disclosure does so at its own peril.  If the impeachment evidence was discoverable and wrongfully withheld, the prejudiced party could . . . seek to have the evidence excluded from trial.  If the impeachment evidence has a substantive purpose, a party cannot hide the ball in discovery . . . . A party's proper designation of impeachment evidence is critical and must be prudently exercised.

*Newsome*, 437 F. Supp. 2d at 438.

### 2. *Sanctions for Violating Rule 26*

Rule 37(c) governs the appropriate remedy for untimely disclosures of witnesses. Exclusion is not appropriate when "the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c). In this case, however, the failure to identify Butler as a declarant is neither substantially justified nor harmless. "[T]he burden of showing substantial justification and special circumstances is on the party being sanctioned," *Banks v. Vilsack*, 292 F.R.D. 158, 160 (D.D.C. 2013) (citing *Hyde & Drath v. Baker*, 24 F.3d 1162, 1171 (9th Cir.1994)), but the plaintiff has made little effort to justify this late disclosure here. The plaintiff argues that the late disclosure of the Butler declaration "posed no surprise to Defendant" because the defendant must have known that Butler was an employee who "would have seen or heard conversations and/or events around the workplace." *Id.* at 5. The plaintiff further responds that such late disclosure is harmless because the defendant may "speak with Mr. Butler at any time Defendant desires." Pl.'s Opp'n Mot. Strike at 5. This is not the case. The plaintiff has not demonstrated that omission of this information was substantially justified or harmless, *see id.* at 4–6, for two reasons.

First, the plaintiff is incorrect that the "defendant's familiarity with Mr. Butler as its own employee negates any element of surprise in this situation." *Id.* at 4. The surprise does not come from learning Mr. Butler's identity, but by learning that the plaintiff intends to use him as a declarant in support of the plaintiff's version of the facts. The contents of the declaration would certainly come as a surprise, given that the parties engaged in discovery for over two years on the plaintiff's retaliation claim, without any mention of Butler or any other witness corroborating the November 15/16, 2006, meeting. *See* Def.'s Mot. Strike at 3. Indeed, the plaintiff's own deposition testimony suggested that there was no such witness. *See* Brooks Dep. at 30:12–16

(identifying Roberto Coquis, and no one else, as having observed the meeting with Cary).

Moreover, assuming *arguendo* that the defendant expected Butler to be called as a witness, it is "undoubtedly prejudiced by being unable to cross-examine" Butler in a deposition due to the plaintiff's untimely disclosure, *see Wannall*, 292 F.R.D. at 36, particularly since the defendant has strenuously challenged the veracity of the substance of the Butler declaration. Def.'s Mot. Strike at 3–5.[8] Contrary to the plaintiff's assertion, the defendant may not "speak with Mr. Butler at any time." Pl.'s Opp'n Mot. Strike at 5. Court-ordered discovery has already closed, *see* 4/1/2013 Minute Order, and Butler—contrary to the contents of his declaration— is no longer employed by the defendant. *See* Def.'s Reply Def. Mot. Strike at 5; *id.* Ex. 2, ECF No. 75-2 (contracting action form and email demonstrating that Butler resigned in 2009).

Second, the manner in which the plaintiff submitted the Butler Declaration was, in particular, not "substantially justified" or "harmless." The plaintiff did not seek leave of the Court to file this late declaration, nor did she confer with the defendant before doing so. The plaintiff did not ask the Court to reopen expert discovery or otherwise provide the defendant with an opportunity to depose this witness before the close of discovery. *See Wannall*, 292 F.R.D. at 33. Moreover, the plaintiff conspicuously omitted any discussion of this new declarant in her

---

[8] The defendant notes that the declaration is "rife with inconsistencies that call its probative value into question." Def.'s Mot. Strike at 4. According to the defendant, the document "twice misspells the declarant's name," *id.* (citing Butler Decl.), identifying the declarant as a physical security officer named "Dwayne Butler," whereas the State Department's "employment records reveal that a Physical Security Officer named <u>DeWayne</u> Butler was employed with OBO." *Id.* at 4 (emphasis in original). Moreover, the defendant contends that although the contents of the declaration, dated September 25, 2013, suggest that the declarant is currently employed at the OBO, *id.* (citing Butler Decl. ¶¶ 1–2) (Butler "ha[s] been Physical Security Officer [sic] for over ten years" and "Coquis <u>is</u> [his] second-line supervisor and <u>has been</u> so since [Mr. Butler] was hired." (emphasis in original)), employment records reveal that physical security officer DeWayne Butler resigned on August 28, 2009, and Coquis resigned on January 20, 2009. *Id.*; *id.* Ex. 2 at 2, 5, ECF No. 75-2 (Butler personal services contracting action form and email, dated August 25, 2008, from Butler submitting a letter of resignation); *id.* Ex. 3 at 2, ECF No. 75-3 (Coquis Notification of personnel action, with approval date of January 16, 2009). Exploring these inconsistencies and others would surely be important to developing the defendant's case. Thus, the late disclosure was certainly prejudicial to the defendant.

28

opposition motion, merely citing to the declaration itself, which was attached as one of 28 exhibits submitted with the plaintiff's opposition. This was highly prejudicial to the defendant.

Under the circumstances here, exclusion is appropriate. *See Daniels v. D.C.*, No. 11-1331, 2014 WL 535213, at *7 (D.D.C. Feb. 11, 2014) (recognizing that exclusion is the appropriate remedy for late disclosed witnesses); *Blake v. Securitas Sec. Servs., Inc.*, 292 F.R.D. 15, 19 (D.D.C. 2013) (excluding witnesses from rebuttal expert report that were not disclosed during discovery as "the overwhelming weight of authority is that preclusion is *required* and *mandatory* absent some unusual or extenuating circumstances—that is, substantial justification." (quoting *Elion v. Jackson*, No. 05-0992, 2006 WL 2583694, at *1 (D.D.C. Sept. 8, 2006) (emphasis in original))); *Nuskey v. Hochberg*, 723 F. Supp. 2d 229, 233 n.1 (D.D.C. 2010) (ordering that witnesses who were not disclosed under Rule 26 would be excluded absent a showing that plaintiff's "failure to identify them earlier was substantially justified or harmless"); *Thomas v. Paulson*, 507 F. Supp. 2d 59, 81 (D.D.C. 2007) (excluding affidavit attached to plaintiff's opposition from consideration of defendant's summary judgment motion because witness was never disclosed during discovery). Here, the plaintiff breached her discovery obligations by failing to disclose Butler after over one year of discovery and has made no showing that the nondisclosure was substantially justified or harmless. In these circumstances, the Butler declaration must be excluded.[9]

---

[9] Even if the Court included the Butler declaration in its analysis of the plaintiff's summary judgment motion, the outcome would be the same, *see infra*, as the Court reaches its decisions on grounds other than those established by the Butler declaration.

**B.  Retaliation Claim**

1.  *Legal Standard*

"Title VII's anti-retaliation provision makes it unlawful for an employer 'to discriminate against [an] employee . . . because he has opposed any practice' made unlawful by Title VII or 'has made a charge, testified, assisted, or participated in' a Title VII proceeding." *Steele v. Schafer,* 535 F.3d 689, 695 (D.C. Cir. 2008) (quoting 42 U.S.C. § 2000e–3(a)).  A *prima facie* case of retaliation requires a plaintiff to show that "(1) [s]he engaged in protected activity; (2) [s]he was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action." *Hamilton v. Geithner,* 666 F.3d 1344, 1357 (D.C. Cir. 2012) (quoting *Woodruff v. Peters,* 482 F.3d 521, 529 (D.C. Cir. 2007)); *see also Howard R.L. Cook & Tommy Shaw Found. ex rel. Black Emps. of Library of Cong., Inc. v. Billington*, 737 F.3d 767, 772 (D.C.  Cir. 2013) (citing *Jones v. Bernanke,* 557 F.3d 670, 677 (D.C. Cir. 2009)); *McGrath v. Clinton,* 666 F.3d 1377, 1380 (D.C. Cir. 2012) ("To prove unlawful retaliation, a plaintiff must show: (1) that he opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against him; and (3) that the employer took the action 'because' the employee opposed the practice."); *Wiley v. Glassman,* 511 F.3d 151, 155 (D.C. Cir. 2007); *Smith v. D.C.,* 430 F.3d 450, 455 (D.C. Cir. 2005); *Morgan v. Fed. Home Loan Mortg. Corp.,* 328 F.3d 647, 650–51 (D.C. Cir. 2003); *Singletary v. District of Columbia,* 351 F.3d 519, 524 (D.C. Cir. 2003); *McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C. Cir. 1984)

With respect to the first element, protected activity encompasses utilizing informal grievance procedures, such as complaining to management or human resources about the discriminatory conduct, as well as the filing of both informal and formal EEO complaints. *Richardson v. Gutierrez,* 477 F. Supp. 2d 22, 27 (D.D.C. 2007) ("It is well settled that Title VII

protects informal, as well as formal, complaints of discrimination."); *Bell v. Gonzales,* 398 F. Supp. 2d 78, 94 (D.D.C. 2005) ("Initiation of EEO counseling to explore whether an employee has a basis for alleging discrimination constitutes protected activity, even in the absence of an unequivocal allegation of discrimination.").  The second element entails an employment action that is "materially adverse," which is defined as one that is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 57 (2006); *Ginger v. D.C.,* 527 F.3d 1340, 1346 (D.C. Cir. 2008).

Finally, a Title VII retaliation claim requires "proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013).  In other words, "traditional principles of but-for causation" apply and the plaintiff must show that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 2533.  The "causal connection . . . may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse . . . action took place shortly after that activity."  *Rochon v. Gonzales*, 438 F.3d 1211, 1220 (D.C. Cir. 2006) (quoting *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)); *Light v. Mills*, 697 F. Supp. 2d 118, 122–23 (D.D.C. 2010) (same) (citing *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000)).

The *McDonnell Douglas* burden-shifting framework applies to retaliation claims such that "[w]here, as here, the employer has proffered a legitimate, non-retaliatory reason for a challenged employment action, the central question is whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-retaliatory reason was not the actual reason and that the employer intentionally retaliated against the employee in violation

of Title VII." *McGrath,* 666 F.3d at 1383 (internal quotation marks, citation, and brackets omitted); *see also Gilbert v. Napolitano*, 670 F.3d 258, 261 (D.C. Cir. 2012) (quoting *Hamilton,* 666 F.3d at 1351) (applying burden-shifting framework to discrimination and retaliation claims); *Jones v. Bernanke,* 557 F.3d 670, 678 (D.C. Cir. 2009) (observing that "these principles apply equally to retaliation claims").[10]

## 2. *Application*

In the first round of briefing, the Court found that the salient inquiry in this case was whether the plaintiff could establish a causal link between her protected activity and Coquis' decision not to renew her contract. *See Brooks*, 841 F. Supp. 2d at 304–06. The plaintiff filed her EEO Complaint on March 13, 2007, s*ee generally* EEO Complaint, which post-dated Coquis' decision not to renew the plaintiff's contract. *Brooks*, 841 F. Supp. 2d at 304. The plaintiff then sought to establish that she had engaged in EEO-protected activity before Coquis made this decision, claiming that she had informally complained to EEO representative Cary on November 16, 2006. *Brooks*, 841 F. Supp. 2d at 304–05. This chronology is why the date and occurrence of this alleged meeting between the plaintiff and Cary gained so much importance. The Court closely examined the evidence regarding the temporal sequence between the date of this meeting on November 16, 2006, and Coquis' decision not to renew her contract eight days later, as memorialized in an email to HR that cryptically stated that Coquis had come across "new information" that led to his decision. *Id*. at 305–06. The Court denied the defendant summary judgment on the plaintiff's retaliation claim given the ambiguity in Coquis' email to

---

[10] The *McDonnell Douglas* framework governs both the plaintiff's Title VII and 42 U.S.C. § 1981 claims. *See Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004) (citing *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1412 n.7 (D.C. Cir. 1998) (applying framework to § 1981 claims)).

HR and the plaintiff's assertion that such meeting had taken place, which raised a material issue of fact based on the record in January 30, 2012. *Id.*

Since that time, after over a year of discovery, the defendant has supplemented the evidence in the record with the depositions of Coquis and Cary, the declarations of Mitchell and the defendant's 30(b)(6) witness, Clarke, and has conducted a further forensic examination of the plaintiff's workplace computer data. *See generally* Def.'s Mem. Exs. 2–6. The defendant has added evidence that Coquis had approached HR about the non-renewal of the plaintiff's contract in early November, Mitchell Decl. ¶ 4; *id.* Ex. 1, before the plaintiff's alleged meeting with Cary, and had been considering the nonrenewal of her contract "over time, at least several weeks if not a month" before sending the email to HR, Coquis Dep. at 164:1–2. Indeed, the evidence shows that Coquis was considering the nonrenewal of the plaintiff's contract as early as October 24, 2006, when he denied her request to attend a training that would take place the following year, *id.* at 170:8–22, 139:1–5; Pl.'s Resp. Def.'s SMF ¶ 11 (disputing Coquis' motive and stating that in January 2007 Coquis approved the plaintiff's development plan which "noted" training courses for 2007).

The defendant has also provided evidence of legitimate, nondiscriminatory reasons for Coquis' non-renewal decision that all occurred before Coquis made this decision, including: (1) Coquis' testimony that the plaintiff sent the inappropriate "10 Truths" email to colleagues, which Coquis "took [] personally as discriminatory" and found "appalling." *id.* at 157:1–5; (2) Coquis deposition testimony stating that, before he made his decision, he became aware of the inappropriate "Spiderman.jpg" image on the plaintiff's computer system, Coquis Dep. at 57:3–16; (3) a forensic examination of the plaintiff's files confirming that the "Spiderman.jpg" image was downloaded to the plaintiff's "My Documents" subdirectory that would have required the

plaintiff's log-in credentials to write into, Clarke Decl. ¶ 6; (4) Coquis' testimony that he had found other inappropriate images in a snapshot of the plaintiff's inbox, *id.* at 65:21–66:5; 61:16–63:21; (5) Mitchell's declaration that OBO South was being restructured under a cost savings effort, Mitchell Suppl. Decl. ¶¶ 2, 5, and that "there was discussions about getting rid of SA-18," Coquis Dep. at 86:8–10; 86:14–15, "in about the summer or fall of 2006," Mitchell Suppl. Decl. ¶ 5, and Coquis was advised that downsizing through attrition would be "the best approach," *id.*; (6) Coquis' testimony that he believed the plaintiff "was becoming careless and irresponsible," Coquis Dep. at 87:14, and "was not able to properly put together [a] PPR presentation," 87:10–11, as he cautioned her in an email on May 24, 2006, *id.* at 156:1–9, and that thereafter her work was "repeatedly late, incomplete, and/or inadequate," Def.'s SMF ¶ 7.[11]

The plaintiff, by contrast, has supplemented the record only with her own deposition testimony, and the Butler declaration, which this Court has stricken as untimely disclosed. *See* Part III.A., *supra*. The Court is, thus, left to evaluate the plaintiff's evidence of a causal link between her alleged protected activity and the non-renewal of her contract with largely the same evidence the plaintiff relied upon to contest the defendant's first motion for summary judgment: (1) the plaintiff's EEO Counselor's Report, Pl.'s First Opp'n Ex. 44; (2) the plaintiff's formal EEO Complaint, filed by the defendant as Exhibit 1 in the defendant's reply to the instant motion for summary judgment, *see* EEO Counselor's Report at 9, and now, (3) the plaintiff's own deposition testimony, also filed by the defendant, as Exhibit 3 to the instant motion for summary judgment, *see generally* Brooks Dep. Both EEO reports contain the same information supplied by the plaintiff:

---

[11] The plaintiff claims that she developed keratitis which affected her work. Pl.'s Resp. Def.'s SMF ¶ 7. This does not negate the defendant's evidence that the plaintiff's work product was inadequate, regardless of the cause.

> I have been trying to file an EEO Complaint since November 2006. I initially informally informed Anita Carey [sic] EEO Representative of my harassment and hostile working conditions. I then tried to set up an appointment to file an official complaint in December 2006. She informed me that she had to take her daughter to the airport and she would call me when she was available. I never received a phone call back.

Pl.'s First Opp'n Ex. 44 at 15; EEO Counselor's Report at 9. These EEO reports do not state that a meeting with the EEO representative occurred in November 2006, but mainly refer to a conversation with Anita Cary that could have occurred in December 2006, when Cary said it did. The plaintiff's deposition simply reiterates what the plaintiff asserted in the first round of briefing, namely, that the plaintiff had a "face to face" meeting with Cary on November 16, 2006, Brooks Dep. at 17:2, 21:8–10, and that Coquis was aware of this meeting because the plaintiff had observed him watching the meeting in the plaintiff's office. *Id.* at 30:21–23.[12]

The deposition testimony of Cary and Coquis contradicts the plaintiff's deposition testimony that Cary met with the plaintiff in mid-November. Cary testified that she has no recollection and no notes of a meeting with the plaintiff occurring in November 2006. Cary Dep. at 58:4, 60:6–61:20 (recalling a "brief encounter" with the plaintiff in December 2006, not

---

[12] The plaintiff cannot defeat a summary judgment motion on the basis of such self-serving testimony alone. *See Arrington v. United States*, 473 F.3d 329, 343 (D.C. Cir. 2006) (recognizing that "summary judgment 'is *most likely* when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined either by other credible evidence, physical impossibility or other persuasive evidence that the plaintiff has deliberately committed perjury" (quoting *Johnson v. Wash. Metro. Area Transit Auth.,* 883 F.2d 125, 128 (D.C. Cir. 1989)) (emphasis added)); *Johnson v. D.C.*, 947 F. Supp. 2d 123, 132–33 (D.D.C. 2013) (finding that "self-serving testimony . . . alone is insufficient to survive a motion for summary judgment"); *Booth v. D.C.*, No. 04-1909, 2010 WL 1375309, at *6 (D.D.C. Apr. 5, 2010) (granting summary judgment on retaliation claim because "aside from [plaintiff's] own self-serving affidavit, there [was] simply no evidence on the record to suggest these events even occurred" thus "there is not enough evidence for a jury to conclude . . . that any such action was motivated, even in part, by [plaintiff's] protected activity"); *Holmes-Martin v. Leavitt*, 569 F. Supp. 2d 184, 208 (D.D.C. 2008) (concluding that "summary judgment would normally be appropriate," "[b]ecause the plaintiff offers no corroboration for her affidavit"); *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 90 (D.D.C. 2006) (finding that "self-serving affidavits alone will not protect the non-moving party from summary judgment" (quoting *Carter v. George Wash. Univ.,* 180 F. Supp. 2d 97, 111 (D.D.C. 2001), *aff'd,* 387 F.3d 872 (D.C. Cir. 2004))).

November); *id.* at 99:1–15 (Cary would normally record such conversations and report them to the Office of Civil Rights but did not do so); *id.* at 109:3–16 (ordinarily notes such meetings and did not record it in her calendar). The plaintiff disputes this, stating that Cary did not recall the date of the meeting, but admitted that November 15, 2006, could have been the counseling date. Pl.'s SMF ¶ 14. This misrepresents the record. Cary states that that such a meeting would not have occurred in November, 2006, but during the first week of December, 2006, which is the only time she recalls speaking with the plaintiff and the only time she would have been in the OBO South building where the plaintiff worked. Cary Dep. at 54:16–55:14, 60:6–61:20 (recalls a "brief encounter" with the plaintiff during an annual training held from December 4th–8th); *id.* at 62:9–13 (stating that this training would be the only time she would have been in the plaintiff's building because she "had no other reason to be down there for anything").

Coquis has unequivocally testified that he did not see the plaintiff meet with Cary. Coquis Dep. at 77:12–17. It additionally appears that until the date of Coquis' deposition on September 12, 2012, he was not aware that Cary was an EEO representative until informed of the fact during his deposition. *Id.* at 75:4–76:3 ("Q: Do you know that [Cary's] an EEO representative? A: No"; "Q: You have no knowledge of that? A: No."). Consequently, even considering the evidence in the light most favorable to the plaintiff and crediting her statement that the plaintiff's meeting with Cary occurred on November 16, 2006, and that Coquis observed it, Coquis has testified that, although he knew Cary was "a staff member of OBO," he had "no knowledge" that she was an EEO representative when the alleged meeting took place. *Id.* at 75:1, 76:2. Considering these facts and the entirety of the record, no reasonable jury would believe that there was a "causal link" between any informal EEO complaint by the plaintiff on November 16, 2006, and Coquis' non-renewal decision, because Coquis did not know that Cary

was engaging in protected activity when he made his decision.  *See Rochon*, 438 F.3d at 1220 ("The causal connection [in retaliation claims] . . . may be established that the employer *had knowledge of the employee's protected activity,* and that the adverse action took place shortly after that activity.") (emphasis added).

The plaintiff disputes Coquis' claim that he did not realize that Cary was an EEO officer on the basis that Cary "admitted that she met with Coquis on several occasions to discuss other employee EEO complaints against him."  Pl.'s SMF ¶ 29 (citing generally Coquis Dep; and Cary Dep.).  This is not the case.  The plaintiff appears to predicate this statement on Cary's testimony that she would speak with someone in the OBO "if he's named in a complaint," Cary Dep. 52:15–17, and that she had counseled three individuals who believed Coquis "wasn't fair" to them or "that they received disparate treatment," *id.* at 51:7–16.  Contrary to the plaintiff's assertion, this testimony does not establish that Cary ever met with Coquis concerning these complaints as she never states that such meeting took place, and does not even state that the counseled individuals filed EEO complaints, thus triggering the need for a meeting.  In short, the plaintiff has not provided evidence to contradict Coquis statement that he did not know that Cary was an EEO representative and thus could have not known the plaintiff was engaged in EEO-protected activity before he made his non-renewal decision.

Moreover, under the *McDonnell Douglas* framework, the defendant has proffered several legitimate, non-retaliatory reasons for not renewing the plaintiff's employment contract, including the declining quality of the plaintiff's work, the downsizing of the department in which she was employed, and her distribution of the "10 Truths" email and finding other inappropriate files on her computer system.  The plaintiff disputes all three of the proffered reasons for the

non-renewal of her contract. Her arguments, however, fail to rebut the defendant's legitimate, nondiscriminatory justifications.

First, the plaintiff states that she performed her job "exceedingly well and in an outstanding manner" based on several awards and ratings of "Excellent" and "Outstanding" that she received in her performance appraisals. *See* Pl.'s SMF ¶¶ 1–3, 26, 30; Pl.'s Resp. Def.'s SMF ¶ 6. The plaintiff's argument is unavailing. The recognition the plaintiff received for her work was based on the time period before Coquis began to consider non-renewal of her contract. *See, e.g.*, Pl.'s Mot. Ex. 1, ECF No. 70-2 (2004-05 performance appraisal); *id.* Ex. 2, ECF No. 70-3 (Nov. 2004 Superb Performance Award); *id.* Ex. 3, ECF No. 70-4 (Sept. 2005 Exemplary Performance Award); Ex. 4, ECF No. 70-5 (Feb. 2006 Exemplary Performance Award); *id.* Ex. 5, ECF No. 70-6 (Sept. 2006 Exemplary Performance Award); *id.* Ex. 6, ECF No. 70-7 (undated Certificate of Appreciation); *id.* Ex. 7, ECF No. 70-8 (letters of congratulation from Coquis to the plaintiff dated Sept. 28, 2005, and February 1, 2006; email from Coquis, dated Sept. 2006, congratulating group of OBO employees, including the plaintiff, on a "great job"); *id.* Ex. 16, ECF No. 70-15 (email, dated May 23, 2006, from Coquis to the plaintiff telling plaintiff "good catch"). The latest date the plaintiff received recognition for her work was her exemplary performance award in September 2006, which precedes the first date Coquis considered non-renewal, in October 24, 2006. Coquis Dep. at 170:8–21, 139:1–5.

Second, the plaintiff disputes that OBO was downsizing, relying on the stricken Butler declaration for support that additional people were hired. Pl.'s Resp. Def.'s SMF ¶ 9. Other than this declaration, the plaintiff provides no evidence to refute the defendant's claim that the plaintiff's contract was not renewed because OBO was restructuring and SA-18 was downsizing through attrition. Mitchell Suppl. Decl. ¶¶ 5, 6.

Finally, regarding the inappropriate emails, the plaintiff argues that these "cannot serve as the basis for Ms. Brooks' termination," because the emails only merited "oral counseling," Pl.'s Resp. Def.'s SMF ¶¶ 8; *see also* Pl.'s Mot. Ex. 26, and that due to a cyber-security grace period, employees were not supposed to be given letters of warning for violations, Pl.'s Resp. Def.'s SMF ¶¶ 12, 15; *see also* Pl.'s Mot. Ex. 28, ECF No. 70-27 (copy of Cyber Security Incident Program regulations). As noted, the so-called grace period only meant that the incidents would not be "entered into [the plaintiff's] permanent incident history record." *See* Pl.'s Mot. Ex. 26. There is no indication that employees would not or could not receive letters of warning, nor does this grace period suggest that personnel decisions could not be made on the basis of inappropriate images found in the computer sweep. Indeed, IT Director Keller and HR Director Mitchell believed Coquis had the authority to issue letters of warning based on inappropriate cyber incidents, as Keller presented the image to Coquis, and Mitchell recommended he issue a letter of warning. Coquis Dep. at 57:9–12. Thus, even had the plaintiff plead a *prima facie* case of retaliation, under the *McDonnell Douglas* framework, the plaintiff's claims would still fail as she has failed to rebut the defendant's legitimate, nondiscriminatory reasons for not renewing the plaintiff's contract.

Accordingly, the defendant is entitled to summary judgment as to the plaintiff's retaliation claim under both Title VII and 42 U.S.C. § 1981.

## IV.    CONCLUSION

For the reasons explained above, the defendant's motion to strike is granted with respect to the one-page document titled "HARASSMENT", and the Butler Declaration, and the defendant's motion for summary judgment is granted. An appropriate Order accompanies this Memorandum Opinion.

DATED: March 31, 2014

                                               _____

                                               BERYL A. HOWELL
                                               United States District Judge